In re **CHICAGO, MISSOURI & WEST-ERN RAILWAY COMPANY, an Illinois corporation, Debtor.**

**CITICORP NORTH AMERICA, INC. and Heller Financial, Inc., Appellants,**

v.

**Daniel R. MURRAY, Trustee, Appellee.**

**No. 88 C 8009.**

United States District Court, N.D. Illinois, E.D.

July 18, 1989.

---

Neal Wolf, Ross & Hardies, Chicago, Ill., for appellants.

Douglas Cassling, Jenner & Block, Chicago, Ill., for appellee.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Daniel R. Murray, the Trustee of the Debtor, the Chicago, Missouri & Western Railway Company ("CM & W" or "Railroad"), applied to the Bankruptcy Court for permission to borrow up to approximately $14 million from agencies of the State of Illinois. The Trustee proposed to secure these loans by granting the state agencies a lien on the CM & W's assets that was senior to the liens of other creditors. The CM & W's primary creditors, Citicorp North America, Inc. and Heller Financial, Inc. ("Lenders"), objected to these so-called "priming" or "super-priority" loans, but Chief Judge John D. Schwartz of this district's Bankruptcy Court allowed the Trustee's application over their objections. *In re Chicago, Missouri & Western Railway Co.*, 90 B.R. 344 (Bankr.N.D.Ill.1988). The Lenders now appeal. For the reasons set forth below, we reverse the decision of the Bankruptcy Court.

### Background

Chief Judge Schwartz wrote an extensive, thoughtful and thorough opinion to accompany his order. The Lenders have not appealed his findings of fact, so we will rely on the Chief Judge's account here. The CM & W, a subsidiary of the Venango River Corporation ("Venango"), owns and operates a 631-mile railroad running between Chicago and Kansas City by way of St. Louis. The CM & W purchased the railroad, along with certain trackage rights and other assets, from the Illinois Central Gulf Railroad Company in April 1987. In order to finance the purchase, Venango arranged an $86,650,000 loan from the Lenders. In addition, the Lenders provided a revolving credit agreement, in the initial amount of $5 million, to finance the Rail-

road's operations. Both loans were secured by a security interest in all of the CM & W's real, personal and mixed property. Both loans were also highly leveraged; Venango, the CM & W's parent, contributed no more than $55,000 in equity.

From the outset, the CM & W failed to meet its operating projections and consequently posted substantial losses. The Lenders subsequently increased the revolving credit agreement, but to no avail. On April 1, 1988, less than one year after starting, the CM & W filed its petition for a railroad reorganization under Subchapter IV of the Chapter 11 of the Bankruptcy Code. 11 U.S.C. §§ 1161–1174. At the time of the petition, the CM & W owed the Lenders over $107 million.

The Trustee Daniel R. Murray[1] found that the CM & W would soon be cashless unless it could obtain additional funding. Because the Lenders refused to advance any further money for operations, the Trustee was forced to look elsewhere. He had to look no farther than Springfield, where he found three state agencies willing to enter into five separate loan agreements. Chief Judge Schwartz summarized the five loans this way.

1–3. From the Illinois Department of Transportation ("IDOT"), three loans or grants. One loan [in the amount of $1,661,290] would finance track rehabilitation and improvements on the Chicago to Springfield corridor ("Amtrak Loan"); the second [in the amount of $860,000] would provide partial funding for improvements in the Carrollton District; and the third [in the amount of $414,000] would fund the construction of the Girard Interchange.

4. A one million dollar loan from the Illinois Department of Commerce and Community Affairs ("DCCA") to be used for working capital, and to create or retain jobs; and

5. A $10,000,000.00 dollar loan from the Illinois Development and Finance Authority ("IDFA"), to maintain and im-

---

1. Mr. Murray is actually the second trustee in this case. He became trustee after the death of former Illinois Gov. Richard B. Ogilvie, the initial trustee.

prove fixed assets and preserve jobs for CM & W employees and shippers.

*Chicago, Missouri,* 90 B.R. at 364. We will not repeat here the details of the loans, which are set out in the Bankruptcy Court's opinion. *See id.* at 350–55. It suffices to note that certain of the loans, especially the IDOT loans, have relatively loose repayment provisions and might better be described as grants. Nonetheless, under some, if not all, of the loans, the state's lien has the potential of becoming senior to the Lenders' lien. That is, to use the language of the Bankruptcy Court, the state loans have the potential of priming the Lenders' lien.

Because of the potential priming effect of the state loan, the Trustee was required under 11 U.S.C. § 364(d) to seek permission from the Bankruptcy court before entering into them. The Lenders objected to all of the loans. Before ruling on the other loans, and upon an emergency request by the Trustee, the Court entered an order authorizing the Trustee to enter into the $1 million DCCA loan and to grant DCCA a senior lien on all the CM & W's assets, except its accounts receivable and certain post-petition assets. The Court expressly reserved the Lenders' objections to the Trustee's other applications to incur secured debt. The Lenders have not appealed the order authorizing the DCCA loan.

On August 24, 1988, after an eight-day hearing, the Court entered Findings of Fact and Conclusions of Law, a Memorandum Opinion and an Order granting the Trustee preliminary authorization to enter into IDOT and IDFA loans.[2] Because the state loans were super-priority loans, the Court looked to the two requirements of section 362(d)(1): that the trustee is unable to obtain credit without giving a senior or equal lien and that there is "adequate protection" of the interest of the creditor whose lien is displaced. The Court concluded that the first requirement was met, because CM & W's Trustee could not obtain

credit without the priming liens. *Chicago, Missouri,* 90 B.R. at 360 (Conclusion No. 40). The Court then went on to consider the more difficult issue of "adequate protection," a matter that we will discuss at great length below. The court noted that the Lenders were undersecured—that is, the value of the collateral securing the loans to the CM & W is less than the amount due. *See id.* at 359 (Finding No. 134). The Trustee argued that despite the senior liens, the Lenders' interest would be adequately protected, because the operation of the CM & W, along with the improvements to be financed by the loans would increase the value of the Lenders' collateral by no less than the total cost of the loans. The Court, however, ultimately rejected this position.

> Though this position is not without merit, it is speculative. Absent the public interest, the proposition does not, as a matter of law, satisfy the requirements of adequate protection of the Lenders' interest in the collateral. (For example, if the Debtor were a private manufacturing corporation, the offer of adequate protection made by the Trustee would be inadequate).

*Id.* (Finding No. 133); *see also id.* at 36–61 (Conclusion No. 4I).

Nonetheless, the court concluded that in a railroad reorganization case, the public interest plays a role in the consideration of priming loans and modifies the requirement of adequate protection. In light of the public interest in keeping the CM & W, the Court concluded that Lenders' interest was adequately protected and allowed the priming loans. It is the consideration of the public interest that the Lenders challenge on appeal, and that we will consider presently.

### Standard of Appellate Review

■ The Lenders do not explicitly challenge the Bankruptcy Court's findings of fact, although they tell us they disagree

---

**2.** The Court subsequently entered final orders allowing the IDOT and IDFA loans on September 8 and September 12, 1988, respectively. Orders No. 60 and No. 61. Order No. 61 prohibits the Trustee from expending any funds from the

IDFA loan without an order from the Bankruptcy Court approving the use of such funds. During the pendency of this appeal, the Bankruptcy Court has permitted the Trustee to expend most of the funds available.

with many of them. They do, however, challenge that court's conclusions of law. A Bankruptcy Court's conclusions of law are to be reviewed under a *de novo* standard. *In re Hilligoss*, 849 F.2d 280, 281 (7th Cir.1988); *In re Excello Press, Inc.*, 90 B.R. 335, 337 (N.D.Ill.1988) (Aspen, J.).

### The Bankruptcy Code

■ Section 364(d) of the Bankruptcy Code, 11 U.S.C. § 364(d), sets out the requirements for super-priority lending:

> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> > (A) the trustee if unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

In turn, section 361 defines, more or less, the concept of adequate protection:

> When adequate protection is required under section 362 or 363, or 364, of this title of an interest of an entity in property, such adequate protection may be provided by—
>
> > (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
> >
> > (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

> > (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

These provisions apply generally to the administration of bankruptcy cases. As may be observed, neither section 361 nor section 364(d) makes any mention of the public interest, and it seems clear that if the CM & W were a widget manufacturer, the public interest would not be taken into account.

The CM & W, however, is not a widget manufacturer, but rather a railroad, as that term is defined in section 101(38) of the Bankruptcy Code. There are under the Code, as there were under the 1898 Bankruptcy Act that it replaced, *see* former 11 U.S.C. § 205,[3] special provisions governing the reorganization of railroads. *See* 11 U.S.C. §§ 1161–1174. Yet even so, the special railroad provisions found in Subchapter IV do not directly support the consideration of the public interest in the context of super-priority loans. While section 1165 does provide for the consideration of the public interest, it does so with careful language:

> In applying sections 1166, 1167, 1169, 1170, 1171, 1172, 1173, and 1174 of this title, the court and the trustee shall consider the public interest in addition to the interests of the debtor, creditors, and equity security holders.

Notably absent from section 1165 is any mention of either section 361 or section 364(d). Nonetheless, the Bankruptcy Court concluded that the legislative history of section 1165 shows that Congress intended the public interest to apply in sections besides those explicitly listed. In support of this proposition, the Court quoted a passage from the Committee Report accompanying the Senate version of the Code, S. 2266. *Chicago, Missouri*, 90 B.R. at 370 (quoting S.Rep. No. 95–989, 95th Cong., 2d

---

**3.** The text of the 1898 Bankruptcy Act is conveniently set out at 11 U.S.C.A.App. (following § 151326) (West 1979).

Sess. 133, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5919). As the Lenders correctly point out, however, the version of section 1165 referred to in the Senate Committee Report was somewhat broader than the version enacted into law. *Compare* 11 U.S.C. § 1165 *with* S. 2266 § 1165, 95th Cong., 2d Sess (1980), *reprinted in* 3 App. *Collier on Bankruptcy* Tab VII at 552–53 (15th ed. 1988) [hereinafter *Collier*].[4] Thus, section 1165 does not support the consideration of the public interest in sections 361 and 364(d). This does not mean, as the Lenders argue, that section 1165 necessarily precludes the consideration of the public interest in any but the listed sections; that the public interest shall be considered in certain specified provisions does not mean that it shall not be considered in others. Still, there must be some justification for recourse to the public interest.

The Bankruptcy Court found its justification, at least in part, in the case law under the 1898 Bankruptcy Act and in a special rule of statutory construction. Under the Bankruptcy Act, the Supreme Court and other federal courts took the public interest into account in different facets of railroad reorganizations. For instance, the Supreme Court considered the public interest in deciding that bondholders had unreasonably rejected a plan of reorganization. "These [bondholders] cannot be called upon to sacrifice their property so that a depression-proof railroad system might be created. But they invested their capital in a public utility that does owe an obligation to the public." *Reconstruction Finance Corp. v. Denver & Rio Grande Western Railway Co.*, 328 U.S. 495, 535, 66 S.Ct. 1282, 1303, 90 L.Ed. 1400 (1946); *see also New Haven Inclusion Cases*, 399 U.S. 392, 489–95, 90 S.Ct. 2054, 2108–11, 26

L.Ed.2d 691 (1970); *Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Railway Co.*, 294 U.S. 648, 671–72, 55 S.Ct. 595, 604, 79 L.Ed. 1110 (1935). *See generally* Graybeal, *Reflections on the Golden Spike: A Look at the Bankruptcy Reform Act and Railroad Reorganization Act and Railroad Reorganization*, 6 Hastings Const.L.Q. 1107 (1979). The Supreme Court did not have occasion to determine whether the public interest should be considered in the context of super priority lending,[5] but the Seventh Circuit did apply the public interest in this context. *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 611 F.2d 662, 666–67 (7th Cir.1979) [hereinafter *Milwaukee Road*]; *In re Chicago, Rock Island & Pacific Railroad Co.*, 545 F.2d 1087, 1090 (7th Cir.1976) [hereinafter *Rock Island*]; *see also In re Third Avenue Transit Corp.*, 198 F.2d 703, 707 (2d Cir.1952) ("As the debtor is a public utility, the judge properly took into account the factor of the public interest in the debtor's continued operations"; note, however, that debtor was not a railroad, but a trolley and bus company); *cf. In re Boston & Maine Corp.*, 484 F.2d 369, 374 (1st Cir.1973) (takes public interest into account in permitting trustee to make certain capital expenditures; not clear from opinion whether any loans were made to finance these expenditures). The Lenders do not dispute that the public interest was taken into account in Bankruptcy Act cases.

The Trustee argues that these Bankruptcy Act cases have continuing validity under the Code. Like the Bankruptcy Court, he relies on the following rule of statutory construction:

> The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a

---

4. We will return below to the legislative history of the Code and the problems inherent in using it.

5. Under the Act, super-priority lending for railroads was governed by section 77(c)(3), former 11 U.S.C. § 205(c)(3), which provided in pertinent part:

> The judge may ... authorize the trustee or trustees to issue certificates for cash, proper-

ty, or other consideration approved by the judge, for such lawful purposes and upon such terms and conditions and with such security and *such priority in payments* over existing obligations, secured or unsecured, or receivership charges, as might in an equity receivership be lawful.

(Emphasis added).

judicially created concept, it makes that intent specific. The Court has followed this rule with particular care in construing the scope of bankruptcy codification. *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 501, 106 S.Ct. 755, 757–58, 88 L.Ed.2d 859 (1986) (citation omitted). The Supreme Court applied the same rule in *Kelly v. Robinson,* 479 U.S. 36, 47, 107 S.Ct. 353, 359–60, 93 L.Ed.2d 216 (1986).

More recently, however, the Court has held that the rule applies only in cases like *Midlantic* and *Kelly,* where the "statutory language ... at least to some degree, was open to interpretation" and where the "bankruptcy law, under the proposed interpretation, was in clear conflict with state or federal laws of great importance." *United States v. Ron Pair Enterprises, Inc.,* — U.S. ——, 109 S.Ct. 1026, 1033, 103 L.Ed.2d 290 (1989). Nonetheless, we do not think the *Ron Pair* limitation precludes our use of the *Midlantic* rule here. Clearly, the laws concerning the reorganizations of railroads, like the environmental laws in *Midlantic* and the criminal laws in *Kelly,* are laws of great importance. Moreover, at least in this case, the first part of the *Ron Pair* limitation requires the same inquiry as the general rule in *Midlantic.* If we apply the *Ron Pair* limitation, we would have to determine whether section 364(d)'s use of the phrase "adequate protection" is "open to interpretation," or whether it clearly prohibits consideration of the public interest. If on the other hand, we apply the general *Midlantic* rule, we would have to determine whether the requirement shows Congress' intent to change the prevailing rule allowing consideration of the public interest. Either way, we must decide whether, as the Lenders argue, the concept of adequate protection is inconsistent with the public interest standard that the Seventh Circuit applied in the *Rock Island* and *Milwaukee Road* cases.

We conclude that there is an unavoidable conflict between the former public interest standard and the concept of adequate protection. We base our conclusion on the language of section 361, the source of that language, the examples given in the section and the section's legislative history. First, the language. Section 361 sets out two methods of providing adequate protection, and then states that adequate protection may also be provided by "granting such other relief ... as will result in the realization by such entity of the indubitable equivalent of such entity's interest." 11 U.S.C. § 361(3). The use of "indubitable equivalent" requires something more than the rather amorphous consideration of the public interest. This conclusion is strengthened when one considers the source of the indubitable equivalent language. As the Supreme Court has noted, *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988), Congress derived the phrase from Judge Learned Hand's opinion in *In re Murel Holding Corp.,* 75 F.2d 941 (2d Cir.1935). In *Murel,* Judge Hand considered the requirement of adequate protection, as then found in 11 U.S.C. § 207(b)(5), and concluded: "It is plain that 'adequate protection' must be completely compensatory.... We see no reason to deprive [a creditor of his property] in the interest of junior holders, unless by a substitute of the most indubitable equivalence." *Id.* at 942. Since Congress relied on this passage in enacting section 361(3), we may presume that it wished adequate protection to be "completely compensatory."

This is also shown by the two examples of adequate protection found in sections 361(1) and 361(2). These sections respectively state that adequate protection may be provided by cash payments or replacement liens. As will be observed, these other examples are concrete and legally recognized property interests. In light of this, it is unlikely that Congress intended the "other relief" set out in section 361(3) to be any less concrete.

Finally, the legislative history supports our conclusion. The 1978 Bankruptcy Code has a somewhat unusual legislative history. There are the usual reports from both houses, *see* S.Rep. No. 989, 95th Cong., 2d Sess., *reprinted in* 1978 *U.S. Code Cong. & Admin.News* 5787; H.Rep. No. 595, 95th

Cong., 2d Sess., *reprinted in* 1978 *U.S. Code Cong. & Admin.News* 5963. However, after the House and Senate passed their versions of the bill, they did not submit it to a formal conference. Rather, the floor managers from each house, Senators DeConcini and Wallop and Representatives Edwards and Butler, met to hammer out the differences between the bills. In lieu of a Conference Report, Sen. DeConcini and Rep. Edwards had essentially identical statements placed in the Congressional Record to explain how they had resolved their differences. *See generally* Klee, *Legislative History of the New Bankruptcy Code,* 28 DePaul L.Rev. 941 (1979). Because of DeConcini's and Edwards' leading role in the passages of the Bankruptcy Code, their statements are entitled to greater weight than would otherwise be the case. *Accord In re Virtual Network Services Corp.,* 98 B.R. 343, 349–50 (N.D. Ill.1989) (Zagel, J.).

In light of this legislative history, we will not rely on the House Report that the Lenders rely on, because it is based on a version of section 361 that was not enacted into law. *Compare* 11 U.S.C. § 361(3) *with* H.R. 8200 § 361(4), 95th Cong., 1st Sess. (1977), *reprinted in* 3 App. *Collier* Tab III at 358. Instead, we rely on the statements made by Rep. Edwards and Sen. DeConcini. Both Congressmen state that "[a]dequate protection of an interest of an entity in property is intended to protect a creditor's allowed secured claim." 124 Cong.Rec. 32395 (1978) (statement of Rep. Edwards), *reprinted in* 1978 *U.S. Code Cong. & Admin.News* 6436, 6444; 124 Cong. 33995 (1978) (statement of Sen. DeConcini), *reprinted in* 1978 *U.S. Code Cong. & Admin. News* 6505, 6512. Protection of a creditor's allowed secured claim is inconsistent with the consideration of the public interest. In light of this, and in light of the other factors discussed above, we conclude that the requirement of adequate protection in section 364(d) conflicts with the consideration of the public interest mandated by the *Rock Island* and *Milwaukee Road* cases.

We conclude, therefore, that Congress intended that the public interest not be considered in the granting of super priority loans, and that the Bankruptcy Court's consideration of this factor was therefore improper.[6]

### Abandonment and Liquidation

The Trustee argues, however, that the public interest should be considered here because denial of the priming liens would lead to the abandonment or liquidation of the CM & W. The Bankruptcy Court found that the "CM & W will soon be cashless unless it can obtain outside funding.... Cashlessness would, of course, require the cessation of operating and, no doubt, the liquidation of the Debtor." *Chicago, Missouri,* 90 B.R. at 364. (In its reply brief, the Lenders argue that denial of the loans in reality would not result in liquidation. However, the Lenders did not appeal the Bankruptcy Court's findings of fact, and we assume that this finding is true.) The Trustee notes that section 1165 requires that the public interest be taken into acount in the abandonment of a railroad line (section 1170) or the liquidation of the railroad's operations (section 1174). The Trustee argues that it would be anomalous for Congress to require consideration of the public interest in abandonment or liquidation proceedings, but then not allow it in applications for priming loans if the priming loans will have the same effect.

■ We recognize the apparent anomaly here, but we do not believe it is our job to correct it. As we have established above, the requirement of adequate protection is inconsistent with the consideration of the public interest. By requiring adequate protection before priming loans may be allowed, whether for a railroad or a widget manufacturer, Congress precluded the consideration of the public interest. This result is supported by the relevant legislative history. Both Rep. Edwards and Sen. DeConcini, in referring to section 1165, stated

---

6. We note that a leading bankruptcy treatise is in accord with our opinion. 5 *Collier* § 1165.02

at 1165–4.

that the public interest should be considered in railroad reorganizations, but only "in applying specific sections of the subchapter." 124 Cong.Rec. 32409 (1978) (statement of Rep. Edwards), *reprinted in* 1978 *U.S.Code Cong. & Admin.News* 6436, 6479; 124 Cong.Rec. 34008 (1978) (statement of Sen. DeConcini), *reprinted in* 1978 *U.S.Code Cong. & Admin.News* 6505, 6548.

The Trustee also suggests that the Bankruptcy Court is a court of equity and may therefore consider the public interest at this point. But as the Supreme Court has stated, "[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988); *see also Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186, 1197–98 & n. 10 (7th Cir.1989). The "confines of the Bankruptcy Code" indicate that the public interest should not be taken into account in applications for priming loans, and we reject the Trustee's arguments to the contrary.

The Benefit of the Lenders' Bargain

█ The Trustee also argues that even with the priming loans, the Lenders will receive the benefit of their bargains and so will receive all the adequate protection that they deserve. Relying on *Reconstruction Finance Corp. v. Denver & Rio Grande Western Railroad Co.*, 328 U.S. 495, 535–36, 66 S.Ct. 1282, 1303, 90 L.Ed. 1400 (1946), the Trustee asserts that investors in railroads are deemed to have accepted the risk that the public interest will be considered, as well as their own, in the event of bankruptcy. Thus, the Lenders' reasonably should have expected that priming loans in the public interest were possible in the event of reorganization.

This line of reasoning, we believe, would improperly permit the Trustee to bring an already rejected public interest argument in through the back door. As we have established in the preceeding sections, the requirement of adequate protection is designed to be "completely compensatory," *Murel*, 75 F.2d at 942, and to protect the

"creditor's allowed secured claim," 124 Cong.Rec. 32395 (1978) (statement of Rep. Edwards). In light of this, the Lenders may have been aware, as the Bankruptcy Court concluded, that priming loans were possible, but not without adequate protection. We reject the Trustee's arguments here as well.

Increase in Value of Collateral as Adequate Protection

Finally, the Trustee argues that the state loans will increase the value of the Lenders' collateral, and they will therefore be adequately protected. However, the Bankruptcy Court, after hearing testimony and evaluating all the facts, rejected this argument as speculative. Because the question of adequate protection is a factual matter, *see* 11 U.S.C. § 364(d)(2) ("trustee has the burden of proof on the issue of adequate protection"), because the Trustee has not filed a cross-appeal on the facts and because he has not pointed to what portions of the record support his argument, we reject the Trustee's final argument.

Conclusion

For the reasons set forth above, we reverse Orders No. 60 and No. 61 of the Bankruptcy Court. It is so ordered.