### In re DELAWARE & HUDSON RAILWAY CO., Debtor.

**Appeals of GUILFORD TRANSPORTATION INDUSTRIES, INC., Boston & Maine Corporation, and Maine Central Railway Company, Mellon Bank, N.A., Xtra, Inc., Appellants.**

### Civ. A. Nos. 90–332 LON, 90–333 LON and 90–334 LON.

United States District Court, D. Delaware.

Jan. 14, 1991.

Eduard F. von Wettberg, III, Joanne B. Wills, Thaddeus J. Weaver, and John D. Demmy of Morris, James, Hitchens & Williams, Wilmington, Del. (Stanley J. Samorajczyk, Linda S. Broyhill, and Robert M. Marino of Hazel & Thomas, Washington, D.C., of counsel), for appellee Dicello, Trustee, Delaware & Hudson Ry. Co.

Jeffrey Goddess, and Mark Minuti of Saul, Ewing, Remick & Saul, Wilmington, Del. (John H. Broadley, and David A. Handzo of Jenner & Block, Washington, D.C., of counsel), for appellants Guilford Transp. Industries, Inc., Boston and Maine Corp. and Maine Central R. Co.

Stephen W. Spence of Phillips & Snyder, Wilmington, Del. (John K. Maser III of Donelan, Cleary, Wood & Maser, Washington, D.C., of counsel), for GE Silicones and Quad/Graphics, Inc.

Edward D. Greenberg, of Galland, Kharasch, Morse & Garfinkle, Washington, D.C., for International Paper Co.

Francis J. Murphy of Ashby, McKelvie & Geddes, Wilmington, Del. (Carmine J. Clemente, Leona D. Jochnowitz of New York State Dept. of Transp., Albany, N.Y., of counsel), for New York State Dept. of Transp.

Palmer L. Whisenant, and William H. Sudell, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Paul M. Singer, Edward A. Bittner, Jr., and Paul J. Kegaly of Reed Smith Shaw & McClay, Pittsburgh, Pa., of counsel), for appellant Mellon Bank, N.A.

Melvyn I. Monzack, and Francis A. Monaco, Jr. of Walsh & Monzack, Wilmington, Del. (Paul R. Duke, Philip R. Stansbury, and Dennis B. Auerbach of Covington & Burling, Washington, D.C., of counsel), for appellant Xtra, Inc.

## OPINION

### LONGOBARDI, Chief Judge.

The Appellants in these three related actions have asked this Court to reverse the Bankruptcy Court's order of June 8, 1990, which authorized the sale of substantially all of the Debtor's assets pursuant to 11 U.S.C. § 363(b) and authorized the establishment of a super priority lien on the Debtor's assets in accordance with 11 U.S.C. § 364(d). Because it is probable that any appeal would be moot after the completion of the sale or establishment of the lien, the Appellants have also filed motions for a stay of the Bankruptcy Court's order pending appeal. The Court has considered the appeal on an expedited basis in order to complete its review prior to the proposed sale date of January 16, 1991.

### PROCEDURAL HISTORY

#### 1. *The Parties on Appeal*

The Debtor and Appellee in all of these actions is the Delaware and Hudson Railway ("D & H" or "the Debtor"), a Delaware corporation. D & H links Eastern Canada and New England to the Southern and Midwestern United States. The primary assets of D & H consist of a 1,500 route mile rail line.[1]

Guilford Transportation Industries, Inc., Boston & Maine Corporation and Maine Central Railway Company ("the Rails"), the Appellants in Civil Action Number 90–

---

1. Approximately 524 route miles are owned by D & H. Approximately 43 miles are leased from subsidiaries and the balance are trackage rights over tracks owned by Conrail.

332 LON, represent secured and unsecured creditors of D & H. D & H is a wholly-owned subsidiary of Guilford Transportation Industries, Inc. ("Guilford"). The Rails have filed claims against D & H of approximately 62 million dollars and the Rails assert that approximately 13 million dollars of this amount is secured.[2] Civil Action No. 90–332 LON, Docket Item 4 at 2 ("332 D.I. 4 at 2").

Mellon Bank, N.A. ("Mellon") is the Appellant in Civil Action No. 90–333 LON. Mellon asserts secured claims against the estate in the amount of approximately 19 million dollars, a portion of which is secured by a lien on substantially all of D & H's operating assets and a further portion is secured by a lien on identified accounts receivable. 333 D.I. 4 at 3. Apparently, the amount of the debt secured by the operating assets is approximately 15 million dollars. 333 D.I. 7 at 6.

Xtra, Inc. ("Xtra") is the Appellant in Civil Action No. 90–334 LON. Xtra asserts a claim of approximately 3 million dollars secured by the operating assets of D & H.

New York State Department of Transportation ("NYSDOT") has filed briefs in support of the Debtor. NYSDOT asserts that beginning in 1974, New York State has contracted with D & H to provide for capital project improvements and maintenance and service obligations. New York State has claimed an ownership interest in the property it provided to D & H in the amount of approximately 67 million dollars. New York State also claims defaults in the amount of approximately 6 million dollars. 332 D.I. 10 at 5. NYSDOT asserts that New York's interests in D & H's assets are senior to the interests of the Rails, Mellon and Xtra ("the Appellants"). *Id.* at 6.

In addition, a collection of companies who use D & H ("the D & H shippers") have filed briefs in support of D & H.[3] The D & H shippers assert that dependable rail service along D & H's lines is essential to their viability. They argue that the public interest dictates that the reorganization of D & H provides for continued rail service. 332 D.I. 6 at 5–7.

### 2. *The Proceedings in the Bankruptcy Court*

The Bankruptcy Court's order of June 8, 1990, Exhibit G in the record on appeal, provides a comprehensive outline of the proceedings related to D & H's petition for reorganization.

D & H filed a voluntary petition for reorganization under Subchapter IV of Chapter 11 of the Bankruptcy Code on June 20, 1988. On June 23, 1988, the Interstate Commerce Commission ("ICC") ordered the New York, Susquehanna, and Western Railroad ("NYS & W") to operate D & H. On June 27, 1988, Francis P. Dicello was appointed as Trustee for D & H. The Trustee attempted to assume direct operation of D & H. After extensive negotiations with regulatory agencies, other railroads, shippers and labor representatives, the Trustee concluded that resumption of service by the estate would not be possible at that time.

The Trustee negotiated with NYS & W and CSX Transportation, Inc. ("CSX") to solicit continued service over D & H's lines from NYS & W and financial support for the continued service from CSX. The Bankruptcy Court approved the Trustee's authority to enter into a Memorandum of Understanding which provided that CSX would provide up to 3 million dollars in working capital to NYS & W and would provide indemnification to NYS & W against loss during the operation over D & H's lines for a period of 18 months after February 13, 1989. The memorandum also provided that if the losses exceeded 1 million dollars, CSX would withdraw its support and indemnification 15 days after providing notice to the Trustee and the ICC.

On February 13, 1989, and March 14, 1989, the ICC invoked its emergency jurisdiction to order NYS & W to continue providing replacement service over the D & H's lines.

---

**2.** Apparently, the Rails are guarantors of a secured debt owed by D & H to Mellon Bank, N.A.

**3.** The shippers are: GE Silicones, International Paper and Quad/Graphics, Inc.

On June 23, 1989, the Bankruptcy Court entered an order authorizing the trustee to solicit bids for the sale of assets and/or reorganization of the Debtor. Pursuant to the order, the Trustee solicited and received six proposals for the purchase of the assets and reorganization of D & H. After extensive negotiations with the parties submitting proposals and after substantial revisions of at least one of the proposals, the Trustee concluded that in his business judgment the proposal of Canadian Pacific Limited ("CP") provided the most favorable terms.

By October 1989, the losses NYS & W incurred by operating the D & H's lines substantially exceeded 1 million dollars and CSX gave notice of its intent to withdraw support and indemnification. On November 17, 1989, the Bankruptcy Court entered an order authorizing D & H to provide limited and specific financial assistance to NYS & W to continue service. Based upon this assistance from D & H, CSX agreed to continue to indemnify NYS & W for losses in excess of D & H's assistance. This modified agreement required that NYS & W notify D & H and CSX when it had reason to believe that the losses incurred after November 1, 1989, reached or exceeded 1.6 million dollars.

On January 9, 1990, the Trustee entered into an agreement with CP for the purchase of substantially all of D & H's assets ("the initial CP agreement"). On January 10, 1990, NYS & W gave notice that the post-November, 1989, losses reached or exceeded 1.6 million dollars. CSX automatically gave notice of its intent to withdraw its financial support and indemnification of NYS & W and CSX's indemnification expired on January 30, 1990.

On January 30, 1990, the Bankruptcy Court authorized the execution of another indemnification agreement, this time between the Trustee, NYS & W, CSX and CP to provide for assistance and indemnification until the expiration of the interim period of service ordered by the ICC. The parties contemplated that after the interim service expired on February 14, 1990, CP would provide indemnification pursuant to the initial CP agreement.

After a hearing on February 9, 1990, the Bankruptcy Court approved the initial CP agreement. A condition precedent to closing the initial CP agreement was that CP and Conrail reach an agreement regarding a grant from Conrail to CP for certain trackage rights. CP and Conrail were unable to reach an agreement, consequently the initial CP agreement was terminated.

Following the termination of the initial CP agreement, the Trustee assumed direct operation of D & H's lines to preserve the value of D & H's estate. The Trustee pursued other options for the sale of D & H or for an orderly termination of service over the lines and liquidation. The Trustee considered selling D & H's lines as a whole and selling discrete pieces of the lines. The Trustee re-solicited proposals for the purchase and reorganization of D & H and received three proposals. Again, extensive negotiations and revisions of the proposals ensued.

The Trustee concluded that in his business judgment the new proposal of CP provided the most favorable terms, was in the best interest of the Debtor, its estate and the creditors and was consistent with the public interest by insuring viable, continuing, competitive rail service in the region served by D & H.

The new agreement dated May 15, 1990, ("the CP agreement") provided that subject to complying with the relevant provisions of the Bankruptcy Code, CP would purchase substantially all of D & H's property for a 25 million dollar cash purchase price at closing plus the assumption of certain liabilities. The property to be purchased was outlined in detail in the agreement. The property includes D & H's operating assets securing the Appellants' and NYS-DOT's claims and would be purchased free of any existing lien.

In order to minimize operating losses to D & H and to provide for continued service over D & H's lines while the CP agreement was being considered, the CP agreement provided that subject to certain contingencies being satisfied or waived, CP would

make arrangements for continued emergency services over D & H's lines. The funds CP expended for this purpose were to be considered a super priority lien against most of D & H's assets.[4] The agreement provided for a 2 million dollar cap on this super priority loan. If the sale was consummated or if CP breached the agreement, this loan would be deemed forgiven.

Following notice to the interested parties, the Bankruptcy Court held a hearing on the CP agreement on June 7, 1990. Guilford, Xtra, Mellon and Interline Railways objected to the CP agreement. The United States, Rail Labor and FELA personal injury claimants entered support in favor of the CP agreement. NYSDOT, the Commonwealth of Pennsylvania and the D & H shippers vigorously supported the Trustee's motion to sell the assets and incur a super priority loan. The Bankruptcy Court made extensive findings of fact and issued an order on June 8, 1990, granting and approving the Trustee's motions.

### 3. *The Appeals*

The Appellants commenced three separate actions in District Court by filing notices of appeal on July 2, 1990. These motions have been fully briefed by the Appellants, the Debtor, NYSDOT and the D & H shippers. Subsequently, the Appellants moved this Court to consider the appeals on an expedited basis. The Debtor opposed the motions for expedited appeals. In a letter dated December 26, 1990, the Court informed the parties that the motion for expedited consideration was under advisement and that a decision on the appeals would be made sometime in January.

On January 2, 1991, the Appellants filed motions with the Bankruptcy Court for a stay of the June 8, 1990, order pending disposition of the appeal. In an order dated January 4, 1991, the Bankruptcy Court denied the motions on two grounds: the motions were untimely filed and the Bankruptcy Court's jurisdiction was not clear; and the Appellants had failed to meet their

burden of proving that they were entitled to a stay.

On January 3, 4 and 7, 1991, the Appellants filed motions to stay the order of the Bankruptcy Court pending this Court's review. In a telephone conference on January 7, 1991, the counsel for the Debtor informed the Court that the CP agreement was likely to close on January 16, 1991. The Court ordered the Debtor to formally respond to the motions. The Debtor has filed briefs in opposition to the Appellants' motions for a stay of the June 8, 1990, order.

The Court will deny the motions for a stay because the Court has completed its analysis of the issues on appeal.

### REORGANIZATION UNDER CHAPTER 11

Before beginning an analysis of the specific issues on appeal, it is helpful to review the statutory framework and case law governing the reorganization of debtors and railroads under Chapter 11 of the Bankruptcy Code.

### 1. *The General Procedure*

A proceeding in Chapter 11 begins when a debtor files a petition with the Bankruptcy Court. 11 U.S.C. § 1121. After filing a petition, the debtor has an opportunity to file a reorganization plan. *Id.* Section 1123 of Title 11 governs what must be included in a plan of reorganization. A proponent of a plan must also submit a disclosure statement. 11 U.S.C. § 1125. Before a proponent of a reorganization plan can solicit approval of the plan from creditors, the Bankruptcy Court must determine that the information disclosure statement is adequate after conducting an information disclosure hearing. In order for a plan to be confirmed, the Bankruptcy court must hold a confirmation hearing. 11 U.S.C. § 1128.

The Bankruptcy Court shall confirm a plan only if certain conditions are met. 11 U.S.C. § 1129. Section 1129(a)(7) requires

---

**4.** The property securing the lien would not include specified cash collateral of the Debtor

securing a portion of Mellon's loan and Xtra's loan.

the Bankruptcy Court to find that each creditor in a class of creditors has (1) accepted the plan; or (2) will receive value under the plan that is not less than the amount the creditor would receive if the estate of the debtor were liquidated under chapter 7.[5]

### 2. *Modifications for Railroads*

■ When the debtor is a railroad, sections 1161 through 1174 apply to the reorganization. Section 1161 provides that certain other sections of the Code, including section 1129(a)(7), do not apply in a case concerning a railroad. 11 U.S.C. § 1161. Section 1165 requires that the Bankruptcy Court and the trustee consider the public interest in addition to the interests of the debtor, creditors and equity security holders. 11 U.S.C. § 1165. Section 1170 provides that after a hearing the Bankruptcy Court may authorize the abandonment of a railroad line if it is (1) in the best interest of the estate or essential to the formulation of a plan; and (2) consistent with the public interest. 11 U.S.C. § 1170(b).

Section 1173 governs the confirmation of plans for reorganizations of railroads. The Bankruptcy Court shall confirm such a plan if (1) the applicable requirements of section 1129 have been met; (2) each claimant will receive or retain under the plan property of a value that is not less than the value of property that each claimant would receive or retain if all of the operating lines of the debtor were sold and the proceeds of the sale and other property were distributed under Chapter 7; (3) prospective earning of the debtor will adequately cover fixed charges provided for by the plan; and (4) the plan is consistent with the public interest. 11 U.S.C. § 1173(a). Section 1174 provides that a Chapter 11 proceeding can be converted to a liquidation proceeding under Chapter 7 if certain conditions are met.

Thus, a reorganization plan for a debtor railroad need only provide each claimant with at least as much value as the claimant would receive if the railroad lines were sold in pieces rather than the value the claimant would receive if the railroad was liquidated for scrap. *See* H.R. 95–595, 95th Cong., 1st Sess. 425 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787 (test is similar to test for ordinary corporate reorganizations but, because railroads cannot liquidate assets and sell them for scrap to satisfy creditors, test focuses on the value of railroad as a going concern). In addition, the reorganization plan of a debtor railroad differs from an ordinary corporate debtor in that it must be consistent with the public interest.

### 3. *Sales of Assets Without a Confirmed Plan*

If a trustee wishes to sell assets of a debtor outside of the ordinary course of business of the debtor and prior to obtaining a confirmed reorganization plan, the trustee must comply with section 363. Section 363 provides that the trustee must provide notice of the sale and the Bankruptcy Court must conduct a hearing. 11 U.S.C. § 363(b). At the request of any party with an interest in the property to be sold, the Bankruptcy Court shall prohibit the sale or condition the sale as necessary to provide for adequate protection of the party's interest. 11 U.S.C. § 363(e). The Trustee bears the burden of showing that the sale is adequate. *Id.* Section 363 also provides that if a Bankruptcy Court orders a sale of the property and that order is not stayed pending appeal, then a reversal of the order on appeal will not effect the validity of the sale if the purchase was made in good faith. 11 U.S.C. § 363(m).

In addition to the notice, hearing and adequate protection requirements specified in section 363, courts have developed several factors to consider in cases where a trustee wishes to conduct a pre-confirmation sale of substantially all of the debtor's assets. The Second and Sixth Circuit Courts of Appeal require that the trustee show there is a sound business purpose for

---

**5.** If section 1111(b)(2) applies to the class of creditors, then section 1129(a)(7) will be satisfied if each creditor will receive or retain value under the plan that is not less than the value of the creditor's interest in the estate's interest in the property that secures the creditor's claims. 11 U.S.C. § 1129(a)(7)(B).

conducting the sale prior to confirmation of a plan. *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.1986); *In re Lionel Corp.*, 722 F.2d 1063, 1068–69 (2nd Cir.1983). A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value. *In re Lionel*, 722 F.2d at 1071.

In a case decided under the 1898 Bankruptcy Act, the Court of Appeals for the Third Circuit held that a pre-confirmation sale could be authorized only upon a showing of emergency. *In re Solar Mfg. Corp.*, 176 F.2d 493, 495 (3rd Cir.1949). In *Solar* the Court of Appeals held that where the debtor's position was improving under the trustee's management, the fact that real estate values were deteriorating did not warrant a pre-confirmation sale of the businesses assets. The fact that the purchase offer was conditioned upon an almost immediate acceptance did not create an emergency which required a pre-conformation sale either.

The issue of whether or not an emergency is required has not been squarely before the Third Circuit since that case. However, in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3rd Cir.1986), the Court of Appeals examined a pre-confirmation sale to determine if it had been made in good faith. In *Abbotts Dairies* the debtor sought a pre-confirmation sale. The debtor was one day away from ceasing operations because its inventory was exhausted. The trustee testified that if the debtor ceased operations its trademarks and customer list would lose substantially all of their value resulting in a loss of 3 to 4 million dollars to the estate. *Id.* at 145. The Court of Appeals did not hold that this was an insufficient reason for the sale;

rather, the Court of Appeals determined that the bankruptcy judge made no implicit or explicit finding of good faith. The Court of Appeals held that "when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *Id.* at 149–50.

The Court of Appeals did not mention the *Solar* decision which has led at least two bankruptcy courts to the conclusion that the Third Circuit follows the "sound business purpose" rather than the "emergency" rule. *See In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 20 (Bankr.E.D.Pa.1987); *In re Coastal Indus., Inc.*, 63 B.R. 361, 366–67 (Bankr.N.D.Ohio 1986).

██ Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith. *Valley Refrigeration*, 77 B.R. at 21. Finally, a court should prohibit or modify the sale at the request of parties with security interests in the property if the court finds that it is necessary to ensure that the parties are adequately protected. 11 U.S.C. § 363(e).

### 4. *Establishment of Super Priority Liens*

Section 364(d)(1) provides after notice and a hearing, senior or equal liens may be established on property of the debtor already subject to a lien only if (1) the trustee is unable to obtain credit otherwise; and (2) there is adequate protection of the interest of the party already holding a lien on the encumbered property. 11 U.S.C. § 364(d)(1). The Trustee has the burden of proof on the issue of adequate protection. If the court orders the establishment of a senior lien and that order is not stayed pending appeal, then reversal of the order on appeal will not effect the lien of an

entity who extended credit in good faith. 11 U.S.C. § 364(e).

## THE BANKRUPTCY COURT'S DECISION

In reviewing the record on appeal, the Court notes that the Bankruptcy Court's June 8, 1990, order authorizing the section 363 sale and section 364 lien contains extensive findings of fact. The order also incorporates findings of fact made by the Bankruptcy Court at the June 7, 1990, and February 9, 1990, hearings.

With regard to the section 363 sale, The Bankruptcy Court found that the Trustee has sound business reasons for assigning the pre-petition assumed contracts and for selling the assets pursuant to the CP agreement. Record on Appeal Item ("R.A. I.") G at ¶ 38. The Bankruptcy Court also found that it is a reasonable exercise of the Trustee's business judgment for the Trustee to enter into the CP agreement. *Id.*

The Bankruptcy Court found that the CP agreement had been negotiated in good faith and was reached as a result of an arm's length transaction. *Id.* at ¶¶ 31, 37. Furthermore, the Trustee made reasonable and good faith efforts to identify and solicit offers from potential good faith purchasers. *Id.* at ¶ 35. The Bankruptcy Court also found that CP is a purchaser acting in good faith as that term is defined in the Bankruptcy Code. *Id.* at ¶ 36.

With regard to the purchase price, the Bankruptcy Court found that CP's offer to purchase D & H's assets and pre-petition assumed contracts is the highest and best offer received by the Trustee. *Id.* at ¶ 35. In addition, the Bankruptcy Court found that a reasonable opportunity has been afforded any person or entity to make a higher and better offer. *Id.* at ¶ 18. The Bankruptcy Court found that CP's purchase offer of 25 million dollars plus other consideration is not subject to any financing contingencies and is backed by 19 billion dollars in net assets. *Id.* at ¶ 24. In addition, the Bankruptcy Court found the total consideration to be realized by the Trustee is fair and reasonable and the sale is in the best interests of the D & H estate, its creditors and the public. *Id.* at ¶ 39.

The Bankruptcy Court found that the State of New York would waive any claims to cash payments from the sale of D & H's assets in exchange for CP undertaking a continuation and maintenance of D & H's service. *Id.* at ¶ 29. The Bankruptcy Court found that the objecting secured creditors were adequately protected because the cash price of 25 million dollars is more than sufficient to cover their alleged interests of 18 million dollars in the property to be sold. *Id.* at ¶ 34.

The Bankruptcy Court found that the notice accurately disclosed the full terms of the sale. *Id.* at ¶ 32. Adequate and sufficient disclosure has been made of any benefits accruing to insiders as a result of the purchase. *Id.* at ¶ 42. The Bankruptcy Court also found that the uncontroverted evidence is that D & H would be in liquidation mode if required to delay a sale until after filing a disclosure statement and obtaining approval for a reorganization plan. *Id.* at ¶ 32. Finally, the Bankruptcy Court found that compelling circumstances exist to approve the sale of substantially all of D & H's assets without a disclosure statement and plan. *Id.* at ¶ 43.

With regard to the establishment of the super priority lien, the Bankruptcy Court found that the lien had a cap of 2 million dollars and would come into existence only if the CP purchase agreement is not consummated and then only to the extent that CP has used the funds to operate D & H's lines. The loan would be deemed forgiven upon consummation of the sale. *Id.* at ¶ 33. The Bankruptcy Court found that the Trustee was not in default or had provided adequate protection that he would cure any default prior to closing the CP agreement. *Id.* at ¶ 40.

The Bankruptcy Court found that NYSDOT has asserted a claim against the estate in an amount of 67 to 68 million dollars. *Id.* at ¶ 29. The Bankruptcy Court further found that NYSDOT would assert its claim in the event of liquidation. *Id.* The Bankruptcy Court found that the indenture agreements between Mellon, Xtra

and D & H recognize that their liens are subordinate to the claims of New York State. R.A.I. A at 7. Noting that the NYSDOT claim must be assumed to be valid, the Bankruptcy Court found that other creditors with security interests in the property would be relegated to unsecured status if D & H were liquidated. R.A.I. G at ¶ 30. Therefore, in the event of liquidation, these parties would have no interest entitled to adequate protection. R.A.I. A at 8.

## ISSUES ON APPEAL

All of the Appellants challenge the Bankruptcy Court's order approving the sale to CP pursuant to section 363(b). Mellon also appeals the establishment of the super priority lien in favor of CP.[6] D & H, NYSDOT and the D & H shippers all argue that the Bankruptcy Court properly ordered the sale and the lien.

### 1. *The Section 363 Sale*

Mellon and Xtra contend that the Bankruptcy Court erred in finding that the sale was supported by a valid business justification. 333 D.I. 4 at 1–2; 334 D.I. 4 at 1–2. The Rails object to the sale on the grounds that the Bankruptcy Court erred in finding that the price CP is paying for the assets of D & H is fair and reasonable. 332 D.I. 4 at 1–2. All of the Appellants argue that the Bankruptcy Court erred in finding that the creditors had received adequate disclosure concerning the proposed sale. 332 D.I. 4 at 2–3; 333 D.I. 4 at 2; 334 D.I. 4 at 1. Finally, the Appellants dispute the Bankruptcy Court's finding that the secured creditors would be adequately protected by the sale.

### 2. *The Section 364 Lien*

Mellon objects to the lien on the ground that the Trustee has not shown that the creditors would receive adequate protection within the meaning of section 364(d). 333 D.I. 4 at 2.

---

**6.** In their motions, all of the Appellants objected to the super priority lien but only Mellon

## ANALYSIS

This Court has jurisdiction to hear the appeals from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a). Findings of fact made by a Bankruptcy Court may not be set aside unless clearly erroneous. *See* Bankruptcy Rule 8013; *In re Spada*, 903 F.2d 971, 975 (3rd Cir.1990). Thus, a reviewing court will affirm the Bankruptcy Court's findings unless "on the entire evidence [the court] is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Conclusions of law are subject to *de novo* review. *Abbotts Dairies*, 788 F.2d at 147; *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 103 n. 6 (3rd Cir.1981).

### 1. *The Sale*

■ Mellon and Xtra argue that the Bankruptcy Court erred in finding there was a valid business justification or compelling circumstances for selling substantially all of D & H's assets pursuant to section 363(b). This Court need not determine whether the sound business reasons test of *Lionel* or the compelling circumstances test of *Solar* applies in order to affirm the Bankruptcy Court because the Court finds that the evidence supports the Bankruptcy Court's findings that each test has been satisfied.

Given that the debtor is a railroad, it is uncertain whether liquidation of D & H for scrap is a viable option. There is ample evidence in the record from the State of New York and the D & H shippers that if the Trustee were to pursue this option it could not be ordered by the Bankruptcy Court because it would not be consistent with the public interest. Therefore, the Trustee's decision to attempt to sell D & H as a going concern represents an exercise of reasonable business judgment. There is evidence in the record which shows that shutting down the railroad while preparing a disclosure statement and reorganization

briefed that issue.

plan would result in significant costs to the estate. The Trustee testified that initial shutdown costs would be in excess of 1 million dollars and each month the estate would incur an additional 500 thousand dollars in costs to preserve D & H's assets. 332 D.I. 5A at 69–70. Running the railroad while attempting to sell it costs the estate approximately 100 thousand dollars a month. *Id.* at 76. The Trustee also testified that preparing a disclosure statement and reorganization plan was going to be a lengthy, complex and litigation filled process. *Id.* at 67–68. There is also evidence in the record indicating that the uncertainty about the future of D & H resulted in a loss of business because shippers were reluctant to enter new contracts with D & H.

In summary, the evidence shows that prior to entering the CP agreement, the estate was losing 100 thousand dollars each month and would lose more if the railroad were not operating, D & H was losing customers due to the uncertainty of its future and the Trustee would not be able to prepare a disclosure statement and plan for some extended period of time. The Court finds that this evidence satisfies both the *Lionel* and *Solar* tests. Therefore, the Bankruptcy Court was not clearly erroneous in finding that there are compelling circumstances and a valid business purpose for selling substantially all of D & H's assets pursuant to section 363(b).

■ The Rails and Xtra argue that the Bankruptcy Court erred in finding that the sale price is fair and reasonable. The sale of the assets to CP would bring 25 million dollars to the estate and leave property in the estate valued at approximately 17 million dollars, for a total of approximately 42 million dollars. *Id.* at 58. The Appellants argue that if D & H were liquidated for scrap the estate would receive between 67 and 80 million dollars. They state that the difference between the appraised value of the estate and the sale value precludes a finding of fair and reasonable price. The Court notes that the cases the Appellants cite for this proposition do not involve reorganization of railroads. *See In re Snyder,*

74 B.R. 872, 873 (Bankr.E.D.Pa.1987); *Valley Refrigeration,* 77 B.R. at 17.

The Trustee argues that because it is unclear whether or not D & H could be liquidated for scrap, it is more appropriate to compare the sale price to the value of the railroad as a going concern. The Trustee testified that a piecemeal sale of D & H's assets would not bring the estate as much cash as the proposed CP agreement. *Id.* at 63.

The Court does not believe that the decisions in *Snyder* and *Valley Refrigeration* require this Court to find that the Bankruptcy Court erred in finding that the consideration offered by CP is fair and reasonable. The 67 to 80 million dollar value is speculative because it is not clear whether or not D & H could be liquidated for scrap. Furthermore, in *Snyder* and *Valley Refrigeration,* insiders were receiving benefits as a result of proposed purchases which gave the courts reason to doubt that the purchase prices were fair. Improper insider benefit is not an issue in this case.

The evidence supporting a fair and reasonable purchase price in this case includes: the extensive solicitation of bids by the Trustee; the negotiations with several prospective purchasers; and the Trustee's testimony that the CP offer was the best offer for D & H's assets. The Court concludes that the Bankruptcy Court's finding of fair and reasonable purchase price was not clearly erroneous.

■ All of the Appellants argue that the Bankruptcy Court erred in finding that they had received adequate notice. They contend that they are entitled to notice that is the functional equivalent of a disclosure statement. They cite *In re Naron & Wagner, Chartered,* 88 B.R. 85 (Bankr.D.Md. 1988), for this proposition. The Appellants are especially concerned about the amount and priority of post-petition labor claims and pre-petition personal injury claims against D & H.

The Trustee argues that notice of unliquidated claims is not required under section 363. The Trustee also claims that these claims are currently being negotiated and

their amounts and relative priorities is not yet known.

■ The Court understands the Appellants' concern. However, the Court has found no authority for the proposition that a notice pursuant to section 363 must include all the information which would accompany a disclosure statement. Although there is language in *Naron* which states that appropriate notice should be a functional substitute for the information in a disclosure statement, the *Naron* court holds only that four pieces of information must be presented to the creditors. The notice should: place all parties on notice that the Debtor is liquidating his business; disclose accurately the full terms of the sale; explain the effect of the sale as terminating the debtor's ability to continue in business; and explain why the proposed price is reasonable and why the sale is in the best interest of the estate. *Id.* at 89.

The Appellants received copies of the CP agreement and were able to cross-examine the Trustee about the agreement and why it was in the best interest of the estate and the creditors. The Appellants were provided with all of the information required under *Naron.* The problem of assessing the magnitude of the unliquidated labor and personal injury claims and their relative priorities is complex and time consuming. There is no precedent which dictates that the Bankruptcy Court must require that this information be included in the notice of the sale. Therefore, the Bankruptcy Court was not clearly erroneous in finding that the parties had received sufficient notice.

■ The Rails and Xtra argue that the Bankruptcy Court erred in finding that the 25 million dollar purchase price is more than sufficient to adequately protect the Appellants' alleged security interests of 18 million dollars. Although they do not dispute that the value of the unsold assets and the sales price is greater than their claims and other currently known expenses, the Rails and Xtra claim that the Bankruptcy Court cannot make a finding of adequate protection until the magnitude and priority of the labor and personal injury claims is known.

They also argue that the Bankruptcy Court erred in finding that in the event of liquidation the New York State claim would relegate other creditors to unsecured status. Xtra claims that there is evidence in the record which shows that New York's claim in the secured assets can be no more than 22.6 million dollars. 334 D.I. 4 at 12–13. From this calculation, Xtra argues that it is better off if the railroad is liquidated because then the labor and personal injury loans could prime Xtra's lien by 24.2 million dollars and Xtra would still be made whole. Xtra argues that under the CP agreement, it will lose money if the unliquidated claims prime its loan by more than 7.9 million dollars.

The Trustee argues that he has satisfied the requirements of section 363(f)(3) which provide that a Trustee may sell property of the estate free and clear of liens in such property provided that "the price at which such property is to be sold is greater than the aggregate value of all liens on such property." 11 U.S.C. § 363(f)(3). Citing *In re Saco Local Development Corp.,* 19 B.R. 119 (Bankr. 1st Cir.1982), the Trustee maintains that the Bankruptcy Court is not required to determine the disposition of sale proceeds prior to confirming the sale.

The Court believes that Appellants are requesting "better" protection, not adequate protection. Xtra and the Rails have introduced no precedent which convinces the Court that the Bankruptcy Court's finding of adequate protection was erroneous because it did not include estimations of unliquidated damages of unknown magnitude and unknown priority. D & H's administrative costs, real estate taxes, employee back wages, employee retirement benefits and the amounts claimed by the objecting creditors is less than the sum of the net sale price plus the unencumbered assets that will not be sold to CP. Therefore, the Bankruptcy Court was not clearly erroneous in concluding the Appellants were adequately protected.

Xtra advances its calculations to argue that the cushion or margin of safety would be bigger in a liquidation scenario, therefore selling D & H's assets to CP does not

provide adequate protection. The Court begins by noting that it does not believe adequate protection requires a comparison of safety margins under various reorganization schemes. Even if the Court thought such a calculation were appropriate, it is not convinced by Xtra's calculation. Xtra's calculation is premised on several assumptions which the Court questions. In order to argue inadequate protection Xtra must assume that the unliquidated claims will prime its claim. The Appellants concede that this is an unknown factor. Second, Xtra must assume that these claims will be in excess of 7.9 million dollars. Again, the amount of the unliquidated claims is unknown. In order to argue that liquidation is preferable, Xtra assumes that D & H could be legally liquidated for scrap. As the Court has previously mentioned, the evidence indicates that it is unlikely that this would be consistent with the public interest. Finally, in determining that New York State's interest could be no more than 22.6 million dollars, Xtra assumes that each mile of track is worth approximately the same amount of money. Given the testimony that the Trustee received bids for certain portions of track and not others, it is not likely that the track sections are fungible. Xtra's calculation does not convince the Court that the Appellants are not adequately protected or that they would be better off under a liquidation scenario.

The Court concludes that the Bankruptcy Court did not err in ordering the sale of substantially all of D & H's assets to CP pursuant to section 363(b).

## 2. *The Lien*

■ Mellon objects to the Bankruptcy Court's order granting the super priority lien on the ground that the Bankruptcy Court erroneously assumed that the Appellants would be relegated to unsecured status in the event D & H were liquidated. This finding, Mellon argues, precluded the Bankruptcy Court from making the appropriate finding of adequate protection under section 364(d). Mellon asserts that the New York State claim would not be more than 28.8 million dollars and this claim would not prime lenders with security in

assets to which New York State has no title.

The Trustee argues that the Bankruptcy Court's finding is correct. The Trustee also argues that section 502(a) of the Bankruptcy Code requires that a claim be deemed allowed unless a party in interest objects.

Although this Court might have reached a different conclusion about the inevitability of the Appellants becoming unsecured in the event that D & H is liquidated for scrap, it would be improper for the Court to conclude that the Bankruptcy Court's finding is clearly erroneous.

The Bankruptcy Court found that the lien would prime the Appellants only if the CP agreement were not consummated. The Bankruptcy Court also found that D & H would be in some form of liquidation if the sale did not occur. New York has submitted a detailed proof of its claim. The Bankruptcy Court found that New York would assert its claim in the event of liquidation. In the February, 1990, hearing, the Bankruptcy Court informed the parties in interest that New York's claim must be deemed valid absent any objection to the claim. The Trustee testified that he did not intend to file an objection to the proof of claim submitted by New York. Although Mellon has standing to file an objection to the claim, it did not.

This Court will not overturn the Bankruptcy Court's finding of facts based upon calculations by the Appellants which were not part of the record before the Bankruptcy Court. The Bankruptcy Court's finding that the Appellants would be unsecured if D & H were liquidated is not clearly erroneous. Nor was the Bankruptcy Court's finding that the Appellants were not entitled to adequate protection under section 364 clearly erroneous.

Mellon also argues that the Bankruptcy Court impermissibly considered the public interest in determining whether the Trustee's motions for the lien should be granted. Mellon argues that the public interest is not a factor listed in section 364 and, therefore, it should not be considered. The Ap-

pellants cite *In re Chicago, Missouri & Western Ry. Co.*, 109 B.R. 308 (N.D.Ill. 1989), *appeal dismissed as moot*, 899 F.2d 17 (7th Cir.1990).

The Trustee argues that consideration of the public interest is essential because D & H is a railroad and must be reorganized in a manner consistent with the public interest.

The Bankruptcy Court found that the holding in *Chicago* was not controlling in this case and this Court agrees. In *Chicago*, a Bankruptcy Court had found that secured creditors would not be adequately protected if the court ordered a super priority lien but determined that the public interest in keeping the railroad operating should be weighed into the analysis. The Bankruptcy Court authorized the lien. *Id.* at 310. The District Court reversed the Bankruptcy Court, reasoning that section 364 did not leave room for consideration of the public interest. *Id.* at 314. In contrast, the Bankruptcy Court has found that the Appellants will not be secured in the event of liquidation and are therefore not entitled to adequate protection.

However, the Court did not have to consider this issue in affirming the Bankruptcy Court. The Court's review of the record indicated that the Bankruptcy Court referred to the public interest only when weighing the likelihood of certain reorganization scenarios proposed by the Appellants. Specifically, the Bankruptcy Court noted that liquidation of D & H for scrap might not be a viable reorganization option because of the public interest in maintaining the railroad. The record does not reflect any findings by the Bankruptcy Court, as the Appellants suggest, that the public interest was weighed as additional consideration for the CP agreement at the expense of the secured creditors.

In conclusion, the Bankruptcy Court's order authorizing a contingent super priority lien of up to 2 million dollars in favor of CP is affirmed.