**In re INDUSTRIAL VALLEY REFRIG-ERATION AND AIR CONDITIONING SUPPLIES, INC., Debtor.**

**Bankruptcy No. 87–03215S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 26, 1987.

Lucy I. Corcoran, Philadelphia, Pa., for debtor.

Joseph Davison, Keith Leonard, Philadelphia, Pa., for Purchasers—IVR 1618 Inc.

Stephen Raslavich, Philadelphia, Pa., for Continental Bank.

Kenneth F. Carobus, Howard S. Klein, Philadelphia, Pa., for Creditors' Committee.

Drew Salaman, Philadelphia, Pa., for Infitec, Inc. et al.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The Motion before us requires us to consider the proper standards to be applied in determining whether a pre-confirmation sale of virtually all of the assets of a Chapter 11 debtor should be authorized. We hold that the recent decision of the Court of Appeals in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir.1986), effectively overrules the prior holding of the court in *In re Solar Mfg. Corp.*, 176 F.2d 493 (3d Cir.1949), that such a sale will be allowed only in "emergencies." However, we hold that such a sale can be permitted only when a good business reason for conducting a pre-confirmation sale is established and, as the *Abbotts* holding suggests, the burden of proving the elements for approval of any sale out of the ordinary course of business—includ-

ing provision of proper notice, adequacy of price, and "good faith"—is heightened. We also hold, again on the basis of *Abbotts*, that the element of "good faith" focuses principally on the element of special treatment of the debtor's insiders in the sale transaction and contemporaneous transactions therewith.

Applying this test to the foregoing Motion, we are compelled to deny it on the present record, principally on the ground of lack of "good faith" due to the element of special, preferential treatment of the Debtor's insiders and, secondarily, on the ground that such "insider deals" have, in all probability, deflated the price. We do believe that the terms of the proposed sale could be rather easily modified to meet the requisite standards, and we recognize the advantages of conducting the sale as soon as possible. We shall therefore set forth the parameters of an acceptable sale transaction and invite the debtor to attempt to accomplish a sale within these parameters, scheduling a continued hearing on this Motion and a subordinate cash collateral Motion on September 3, 1987, to which date we shall authorize the Debtor to continue to use cash collateral.

This case was filed as an involuntary Chapter 7 matter on June 30, 1987. We learned at the hearing on the matters in issue that the petition was filed by certain creditors to thwart a bulk sale of the Debtor's wholesale commercial air conditioning distributorship business to a corporation then known as Tesco-Rac, Inc. for a total price of $640,000.00, scheduled to take place later on the date of filing.

On July 21, 1987, the Debtor converted this case to a Chapter 11 matter and the following day filed a Motion to obtain approval of a Stipulation between the Debtor and its principal secured creditor, Continental Bank (hereinafter referred to as "the Bank"), which would permit the Debtor to use cash collateral. This Motion was initially opposed by the Official Unsecured Creditors' Committee (hereinafter referred to as "the Committee"), on which we assume that the filing creditors are the instrumental members, but ultimately, after

a slight change of wording, the Stipulation was provisionally approved until August 13, 1987, when a hearing to consider further use of cash collateral was scheduled. On July 27, 1987, the Debtor filed the Motion for Approval of Asset-Purchase Agreement, dated July 20, 1987, pursuant to 11 U.S.C. § 363 (hereinafter referred to as "the § 363 Motion"), which is the centerpiece of this Opinion, and this hearing was also scheduled, on an expedited basis, on August 13, 1987.

Because the § 363 Motion presented a difficult legal issue of the standards to be applied in considering such motions, and the facts adduced made the decision problematical, we asked any interested parties to file Briefs supporting their respective positions on this issue on or before August 20, 1987. When we indicated that we hoped to make a decision on this matter by August 27, 1987, the Bank agreed to allow the Debtor to use cash collateral through that date.

Four of the parties participating in the hearing filed Briefs. Three of these—the Debtor, the proposed purchaser, and the Bank—urged that this Court grant the § 363 Motion. The Committee opposed this Motion. The Debtor and the purchaser briefly addressed and urged this Court to approve the cash collateral Motion. The Bank opposed the latter motion and the Committee contended that the outcome of this matter was "uncertain."

At the hearing, five witnesses were called in support of, principally, the § 363 Motion, and none in opposition. Because the facts appear fairly clear and we need not comport with Federal Rule of Civil Procedure 52(a) in deciding a motion, *see In re Campfire Shop, Inc.*, 71 B.R. 521, 524–25 (Bankr.E.D.Pa.1987), this Opinion is drafted in narrative form.

The principal witness called was James T. McGinley, Jr., Vice-President of the Debtor and the son of the principal. He testified that the Debtor was losing money, even through its busy season, i.e., May through August, and would continue to do so unless an unattainable amount of capital (approximately $750,000.00) were obtained

to purchase a sufficient inventory. For this reason, the Debtor had been prepared to make a bulk sale of the business in June, 1987, which had been halted by the bankruptcy.

Mr. McGinley testified to a figure which put flesh upon the skeletal description of the consideration to be paid in the proposed Purchase Agreement set forth in the sale notice, i.e., (1) eighty (80%) percent of accounts receivable due within ninety (90) days; (2) fifty (50%) percent of the cost of inventory; and (3) the fair market value of the real estate and the fixtures; and a total of $2,500.00 for assignment of all leases and other assets. The first item was estimated at $125,000.00; the second at $230,-000.00; and the third was definitely placed at $80,000.00 and $45,000.00, for the realty and fixtures, respectively, or a total of $125,000.00. The grand total of consideration to be paid was therefore about $482,-500.00, in contrast to the $640,000.00 figure offered in the bulk sale transaction of June 30, 1987.

Mr. McGinley also related the terms of two contracts contemporaneous to the Purchase Agreement, also dated July 20, 1987: (1) An Employment Agreement with Mr. McGinley's father, whereby the father would be employed in a managerial capacity for five years at $60,000.00 per annum. This contrasted with the father's present pay rate of $50,000.00 per annum; (2) A Commercial Lease with Option to Purchase between the purchasers and Patricia McGinley, the mother of the witness, with respect to a warehouse located proximate to the Debtor's principal place of business. The term of this Agreement was five years and the total rent was $200,000.00, payable in monthly installments of $3,333.33. These figures represented an increase of $1,600.00 monthly, or $96,000.00 total, over that in the present lease arrangement between the Debtor and Mrs. McGinley.

Further identity of the new purchaser under the Agreements which were the subject of the § 363 Motion, known as IVR 1618, Inc., was provided by Mr. McGinley, and expounded further by the testimony of another witness, Carmen Carosella, the

Treasurer of the purchaser. Mr. Carosella established that the purchaser was simply a successor to Tesco-Rac, Inc., which had changed its name in the interval between the bulk-sale agreement and the negotiation of the Agreements in issue.

Mr. McGinley contended that the industry in which the Debtor did business was small, and that the Debtor's availability had been well-publicized by word-of-mouth since October, 1986. However, only the present purchaser and its predecessor had surfaced as prospective buyers. Mr. McGinley attributed the reduction in the sum offered in the instant Purchase Agreement of July 20, 1987, from that in the bulk-sale agreement of June 30, 1987, to the fact that the most useful inventory had been depleted in the intervening time, and the end of the Debtor's busy season was approaching. The prior deal, in which $640,000.00 was offered, included the same amenities for his father and his mother, and the reduction was due to a purported over-valuation of the realty at $150,000.00, in addition to reductions in accounts receivable and inventory.

In addition to Mr. Carosella, the Debtor's witnesses were the following: (1) Robert J. Urbanski, who had prepared the appraisal of the Debtor's realty at $80,000.00; (2) Arden Merbach, who had appraised the Debtor's fixtures at $45,000.00 to $50,000.00. Mr. Merbach was an auctioneer, but he counselled against selling any part of the Debtor's property by auction, because of the limited market for its inventory; and (3) J. William Brehm, a work-out officer employed by the Bank. He indicated that the loan balance, secured by virtually all of the Debtor's assets and the residence of the elder McGinleys, was $225,000.00 as of July 31, 1987.

The subject of the proper standards to be applied in determining if and in what circumstances a bankruptcy court should allow a pre-confirmation sale pursuant to 11 U.S.C. § 363(b)(1) has been the subject of a rather substantial body of caselaw. The issue arises due to a tension, as noted in *In re Baldwin United Corp.*, 43 B.R. 888, 905 (Bankr.S.D.Ohio 1984), between the neces-

sity that a debtor ordinarily must prepare and obtain acceptances and confirmation of a Plan, pursuant to Subchapter II of Chapter 11, 11 U.S.C. §§ 1121–29, before the debtor can consummate a sale of substantially all of its assets; and 11 U.S.C. § 363(b)(1), which simply provides, without qualification, as follows:

> (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

Conspicuously absent from the Code is any guidance as to if and when a sale other than in the ordinary course of business can and should be allowed outside of the context of the structure of Subchapter II of Chapter 11.

Nevertheless, our research indicates that, although pre-confirmation sales have been denied for a variety of reasons, appellate courts, as well as bankruptcy courts, have recognized that, in certain circumstances, such sales are permissible. The decisions at the Court of Appeals level interpreting the Code which are most frequently cited are *Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir.1986); and *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir.1983). In *Stephens,* the Court endorses what it terms as the *Lionel* test in approving a sale: "a bankruptcy court can authorize a sale of all of a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action." 789 F.2d at 390.

Actually, this is somewhat of an oversimplification of the result of the historical analysis of the Court in *Lionel,* which reversed an order allowing a pre-confirmation sale. The general conclusions of the *Lionel* court are as follows:

> Just as we reject the requirement that only an emergency permits the use of § 363(b), we also reject the view that § 363(b) grants the bankruptcy judge *carte blanche.* 722 F.2d at 1069.

In providing standards for interpretation of § 363(b), the Court states as follows:

> In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest

groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge. *Id.* at 1071. In *Lionel*, the § 363(b)(1) motion was denied because the Court concluded that the bankruptcy judge had improperly followed the "hue and cry" of a vocal Creditors' Committee.

As the first paragraph of this Opinion indicates, our local Court of Appeals has addressed this topic in *Abbotts Dairies*, *supra*, and *Solar Mfg.*, *supra*. In *Solar Mfg.*, a pre-confirmation sale was denied because the fact that the Debtor's business would be likely to depreciate if there were a delay was held not to be such an emergency as to allow a sale outside the ordinary course of proceedings under Chapter X of the Bankruptcy Act. Were we obliged to follow *Solar Mfg.*, we would be inclined to observe that the circumstances held insufficient to constitute an emergency there are very closely analogous to the circumstances which cause the Debtor here to seek a pre-confirmation sale pursuant to § 363(b)(1). However, we believe that, in *Abbotts Dairies*, the Court of Appeals effectively overruled *Solar Mfg.*, having failed to even cite it in a case which obviously presented the same sort of problem. *Accord, In re Coastal Industries, Inc.*, 63 B.R. 361, 366–67 (Bankr.N.D.Ohio 1986) (Court opines that Third Circuit follows essentially the *Lionel* standard). *See also*

*In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 390, 397–98 (Bankr.E.D. Pa.1987) (argument that settlement agreement should be denied because it constituted a pre-confirmation sale was rejected); and *In re W.R. Brown, Inc.*, Bankr. No. 86–04108S (Bankr.E.D.Pa., Order filed September 19, 1986) (Pre-confirmation sale of all assets of Debtor permitted within thirty (30) days of bankruptcy filing).

*Abbotts Dairies* concerned a sale of virtually all of the assets of the debtor, a motion to approve which was filed on August 10, 1984, the same date as that of the filing of the petition in bankruptcy; was approved on an interim basis on August 17, 1984; and was finally approved on September 12, 1984. Yet, despite this extremely accelerated sale process, the Court of Appeals remanded the proceeding on only one basis: the failure of the bankruptcy court to make a specific finding that the sale was conducted in "good faith," per 11 U.S.C. § 363(m). There was no discussion whatsoever of a need to show an "emergency" situation. The only portion of the Opinion even touching upon this issue was a statement that the record contained evidence that the debtor's working capital was so substantially depleted that it could no longer purchase milk, 788 F.2d at 145, which is an economic crises similar to that facing the debtors both in *Solar Mfg.* and here. We therefore conclude that the Third Circuit has, consistent with *Stephens* and *Lionel*, abandoned the "emergency-only" standard for allowance of pre-confirmation sales enunciated in *Solar Mfg.*

Unfortunately, it is difficult to ascertain with what the *Solar Mfg.* test has been replaced, because the *Abbotts Dairies* Opinion focuses solely upon the element of "good faith." We believe that "good faith" must be an element of all sales under § 363(b), whether pre-confirmation or post-confirmation, and irrespective of whether all or most of a debtor's assets are sold, or whether only a portion of assets are sold out of the ordinary course of business. *See In re Snyder*, 74 B.R. 872, 876–77 (Bankr.E.D.Pa.1987), *leave to appeal de-*

*nied,* C.A. No. 4746 (E.D.Pa., Order entered August 5, 1987).

In *Abbotts Dairies,* the Court of Appeals expressed particular concern with a contemporaneous deal between the purchaser and the Debtor whereby a principal of the Debtor was employed by the purchaser in a lucrative employment contract. 788 F.2d 145–46, 148. Such "insider dealing" is perforce an element of "good faith," because requiring a purchaser to "take care" of an insider financially will almost inevitably deflate the purchase price.

The *Abbotts Dairies* Court was also concerned that there may have been collusion between the debtor and the purchaser regarding the timing of the bankruptcy filing, thus chilling the bidding. *Id.* at 149. Therefore, the court suggested that particular attention was required to determine whether the price received had in fact been "fair and reasonable." Whether the price received is fair and reasonable is, however, always a concern of a bankruptcy court in deciding whether to approve a sale pursuant to § 363(b)(1). *See Snyder, supra,* at 877–78.

Finally, the *Abbotts Dairies* Court was also concerned about certain aspects of the sale notice, in particular the failure of the notice of the final sale agreement to explain the consultant agreement with the Debtor's principal or to fully explain the approval of the interim agreement approved by the Court seven days after the bankruptcy filing. *Id.* at 145–46. Again, we observe that proper notice to interested parties is a prerequisite to any valid § 363(b)(1) sale. *See In re Fernwood Markets,* 73 B.R. 616 (Bankr.E.D.Pa.1987).

■ We therefore conclude that the standards for allowance of a pre-confirmation sale pursuant to § 363(b)(1) are that the sale proponent must show not only that there is both a "sound business purpose" why the sale should be allowed to take place outside of the ordinary course of Subchapter II of Chapter 11, taking into account the factors suggested by *Lionel,* but that the proponent must also make a strong showing that all of the requirements for any § 363(b)(1) sale are met.

*Compare In re Ancor Exploration Co.,* 30 B.R. 802, 808 (N.D.Okla.1983); and *Baldwin United, supra,* 43 B.R. at 905–07. These elements are the provision of accurate and reasonable notice; a showing that the price to be paid is adequate, i.e., fair and reasonable; and establishing that "good faith," i.e., the absence of any lucrative deals with insiders, is present. The strength of the showing necessary to satisfy each of these elements is heightened by the fact that the protections of Subchapter II of Chapter 11 are absent, and such agreements are typically considered on an expedited basis, thus impeding interested parties from making the complete investigation and amassing of contrary evidence which otherwise would be possible.

■ The instant factual matrix can now be considered in light of the foregoing standards. We believe that the Debtor has met its burden of showing that a pre-confirmation sale is warranted here. The testimony of Mr. McGinley is unrebutted and unshaken in establishing that the Debtor is on a downward spiral and that the value of the business will steadily decline until at least spring. There is no evidence that, having an aging inventory, the value of the business will increase even in the following spring. The fact that the goal of the Debtor was liquidation, even prior to the bankruptcy filing, convinces us that the perception that the Debtor cannot recover was not formed hastily. A sale of its assets appears the inevitable course for the Debtor and delay only will depress the sale price. Thus, there is a "sound business purpose" for allowing a sale to take place outside of the ordinary course of Subchapter II of Chapter 11.

■ With respect to the notice, we note that it made no mention of the Contemporaneous Employment Agreement with James T. McGinley, Sr. or the Commercial Lease Agreement with Patricia McGinley. We also note that the notice failed to even estimate the purchase price offered in the sale. This was an important deficiency in the sale process, and could, in itself, have been fatal to the Motion. However, we note that neither the Committee nor the

other objecting creditors raised any objection on this score. Also, the Debtor was quite candid in presenting the contemporaneous Agreements and the actual sale figures at the hearing. While, in a future case, we could conceive of disallowing a sale on this basis alone, we shall not do so here, due to the apparent lack of perception of prejudice on the part of the parties opposing the Motion and the fact that we believe that requiring a new notice would put off the sale for a considerable time, to the detriment of all involved. Therefore, we shall not deny the Motion on this basis.

When we approach the "fair and reasonable" price requirement, the Debtor's position is further weakened. Certainly, the appraisals of the real estate and the fixtures were impressive in establishing that the components of the sale price were adequate. We can accept the testimony that the values of the lease assignments, good will, and any other assets, are nominal. It is less clear why the inventory and accounts receivable were valued at such depressed figures. It is particularly disturbing that the proposed sale price in the Purchase Agreement of July 20, 1987, is a twenty-five (25%) percent reduction from the $640,000.00 price offered on June 30, 1987, less than three weeks before, by the same purchaser.

We do acknowledge that the warm bidding for the debtor's assets which pervaded the *Abbotts Dairies* factual pattern is absent. This suggests that there is little interest from competitive prospective purchasers. This factor also supports Mr. McGinley's testimony that the availability of the Debtor's business has been well-known in the industry for some time and no other offers have surfaced or are likely to surface. *Compare In re WFDR, Inc.*, 10 B.R. 109 (Bankr.N.D.Ga.1981) (word-of-mouth advertising held sufficient in closed industry; nevertheless, a significantly higher bid was offered in response to the sale notice). Therefore, if the Debtor were to receive a figure approximating the previous $640,000.00 offer, we could not perceive any just basis for finding such an offer less than "fair and reasonable."

■ However, we believe that the Debtor clearly stumbles and falls at the "good faith" requirement. The Employment Agreement contemplates a $60,000.00 salary—a $10,000.00 annual raise—to James T. McGinley, Sr. for the next five years, a total dollar commitment of the purchaser of $300,000.00. All that we know of Mr. McGinley is that he chose to have his son (who received $26,000.00 annually and who has no contract with the purchaser, probably because it is perceived that his presence will be necessary without the security of a contract) speak for him at the hearing. These facts do not inspire our confidence that Mr. McGinley, Sr. is indispensable to the business and they suggest to us that the Employment Agreement is a "sweetheart" contract having no other effect but to subsidize Mr. McGinley, Sr. personally and to reduce the purchase price.

With respect to Mrs. McGinley and her warehouse, we know of no reason why the rent should be increased about forty-eight (48%) percent as a consequence of this purchase agreement. We have no appraisal of the fair-rental value of this building before us. The increment in the rental over five years would be $96,000.00. This, too, appears to be a subsidy to an insider which is deflating the purchase price to be paid to the Debtor and shared by all creditors.

In sum, we will not allow the elder McGinleys to profit inequitably from the agreement. We would rarely, if ever, find the requisite good faith present where the purchase agreement is linked with contracts or other arrangement in which an insider is offered a greater salary or other emoluments than the insider is receiving from the Debtor prior to the sale. Hence, we find the requisite "good faith" lacking here.

■ We believe that this transaction could be salvaged with a few adjustments which cure the deficiencies that we believe are fatal to the deal as presented to us on August 13, 1987. If the purchaser were still prepared to offer $640,000.00, and to deduct the depression in the value of the business since June 30, 1987, from the amounts offered in the Employment Agree-

ment and the Lease Agreement to Mr. and Mrs. McGinley, we could quite conceivably approve the Purchase Agreement, even over the objection of the Committee. We could picture the purchaser's offering $640,000.00 if the Employment Agreement were reduced to $50,000.00 for three years and the Lease Agreement reverted to the present terms, thus offsetting the $157,-250.00 increment in price with a $246,-000.00 savings in payments to Mr. and Mrs. McGinley. Moreover, elimination of this element of insider dealing may satisfy the Committee that such a transaction is the best possible under the circumstances. And other acceptable arrangements which we are unable to picture are certainly possible.

We are therefore according the Debtor a brief period to realign the transaction into a form that we could approve. Sharing the Debtor's concern about the necessity to act quickly, we are scheduling a continued hearing on the § 363 Motion on September 3, 1987, at which time we will consider whether we can approve any revised Purchase Agreement and other contemporaneous agreements which the Debtor can produce.

We will also order that the Debtor shall be authorized to utilize the Bank's cash collateral through September 3, 1987, the date of a continued hearing on that Motion as well. We observe that, since the value of the Debtor's assets is at least $482,-500.00, the Bank's $225,000.00 debt, secured by these assets and the elder McGinleys' residence, is obviously well-protected by an equity cushion sufficient in size to constitute adequate protection. *See In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 376, 386 (Bankr.E.D.Pa.1987), *aff'd,* 75 B.R. 819 (E.D.Pa.1987).

An Order consistent with the foregoing Opinion will be entered by us.