UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 93-2244
IN RE SAVAGE INDUSTRIES, INC.,
Debtor,



WESTERN AUTO SUPPLY COMPANY,

Defendant, Appellee,

v.

SAVAGE ARMS, INC.,

Plaintiff, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Frank H. Freedman, Senior U.S. District Judge]



Before

Torruella, Cyr and Boudin,

Circuit Judges.



Paul H. Rothschild, with whom Michael B. Katz, Susan Luttrell
Burns and Bacon & Wilson, P.C. were on brief for appellant.
Mark G. DeGiacomo, with whom James P. Rooney, Edward J. Rozmiarek
and Roche, Carens & DeGiacomo were on brief for appellee.


December 14, 1994
 

CYR, Circuit Judge. The question presented on appeal CYR, Circuit Judge.

is whether the bankruptcy court properly enjoined a state-law

based "successor product-line liability" action in an Alaska

court against an entity which had acquired a corporate chapter 11

debtor's assets by purchase and subject to an explicit disclaimer

of liability on all unfiled claims relating to products

manufactured by the chapter 11 debtor. On intermediate appeal,

the district court vacated the injunction. As we conclude that

injunctive relief was improvidently granted, we affirm the

district court order.

I I

BACKGROUND BACKGROUND

A. The "Successor Liability" Claim A. The "Successor Liability" Claim

In February 1988, Savage Industries, Inc. ("Debtor

Industries"), a Massachusetts firearms manufacturer, commenced

voluntary chapter 11 proceedings in the United States Bankruptcy

Court for the District of Massachusetts and obtained

authorization to operate its business as a debtor in possession.

One month later, appellant Savage Arms, Inc. ("Arms") was incor-

porated. In May 1989, Debtor Industries submitted a proposal to

sell substantially all its corporate assets to Arms.1 The

bankruptcy court approved the proposed sale in July 1989.



1The assets included all Debtor Industries' real estate,
manufacturing equipment, leases, contracts, corporate records,
patents, trademarks, cash, accounts receivable, and inventory.
The assets were sold subject to all liens.

2

Although the court order prescribed safeguards for interests held

by objecting creditors, it neither required court approval of the

asset-transfer terms subsequently negotiated between Debtor

Industries and Arms, nor made provision for the interests of

holders of contingent product liability claims against Debtor

Industries.2

On November 1, 1989, Debtor Industries and Arms closed

their asset transfer agreement, wherein Arms assumed liability

for certain pending product liability claims against Debtor

Industries, but explicitly disclaimed all liability for any other

product liability claims relating to firearms manufactured by

Debtor Industries prior to the closing date.3 Debtor Industries


2The order approving the sale provided as follows:

ORDERED, that [DEBTOR] INDUSTRIES . . . is
hereby authorized to enter into and conclude
within sixty (60) days of this Order becoming
final and non-appealable a Definitive
Agreement (the "Agreement") with SAVAGE ARMS,
INC. ("Purchaser") providing for the sale and
transfer of its real property and certain of
its tangible and intangible assets to
Purchaser and the assumption by Purchaser of
certain secured and priority liabilities as
set forth in this Order . . . .

3Section 2(b) of the Asset Transfer Agreement states, in
pertinent part:

Arms does not assume, and [Debtor Industries] shall
pay, perform and discharge:
. . . .
(iv) any liability or obligation resulting from or
arising out of claims for personal injury or property
damage based on the malfunction or failure of any
product manufactured or distributed, in whole or in
part, by [Debtor Industries], arising out of any act,
omission, event, occurrence or circumstance that
existed on or before Closing, except to the extent

3

ceased to operate immediately after the asset transfer was

consummated. Thereupon, without interruption, Arms took up the

manufacture of the identical lines of firearms previously

produced by Debtor Industries.

Meanwhile, in May 1989, shortly before Debtor

Industries submitted its proposal to transfer its assets to Arms,

Kevin Taylor had been injured by a "Stevens" .22 caliber firearm

manufactured by Debtor Industries. One year after the chapter 11

asset transfer was consummated, Taylor brought a products

liability action against Debtor Industries in an Alaska state

court. Later, Western Auto Supply Company ("Western Auto"), the

retail distributor which sold Taylor the allegedly defective

firearm, was added as a party defendant. Although Taylor did not

name Arms as a defendant, in due course Western Auto filed a

third-party complaint alleging that Arms had incurred "successor

product-line liability" under Alaska law by continuing to

manufacture the identical firearms theretofore manufactured by

Debtor Industries. Western Auto demanded either indemnification

or an apportionment of damages from Arms as successor to Debtor



expressly set forth in Schedule 2 or Section 4(f)
hereof . . . .

Debtor Industries warranted, in Section 6(e), that only 44
product liability claims were pending at the time of the asset
transfer. In Section 4(f), Arms conditioned its purchase
agreement on the bankruptcy court's estimate that 24 pending
prepetition product liability claims against Debtor Industries
did not exceed $400,000 in aggregate value.

4

Industries.4

In June 1991, the bankruptcy court confirmed the

chapter 11 liquidation plan, which made no provision for

contingent product liability claims disclaimed by Arms under its

November 1989 asset transfer agreement with Debtor Industries.

The asset-transfer proceeds began to be disbursed under the

confirmed chapter 11 plan in February 1992.

Thereafter, Arms commenced this adversary proceeding

against Western Auto in the United States Bankruptcy Court for

the District of Massachusetts, requesting declaratory and

injunctive relief against further prosecution of Western Auto's


4As a general rule, a corporation which acquires another
corporate entity's assets does not assume the seller's
liabilities unless (1) the buyer expressly assumes those
liabilities; (2) the transaction constitutes a merger or
consolidation; (3) the buyer is a mere extension of the seller;
or (4) the transaction amounts to a fraudulent or collusive
attempt to avoid the seller's liabilities. See Conway v. White
Trucks, 885 F.2d 90, 93 (3d Cir. 1989); Ray v. Alad Corp., 560
P.2d 3, 7 (Cal. 1977). Several states, including California and
New Jersey, have adopted a "hybrid" exception to the general rule
precluding implied successor liability, known as "product-line"
liability. Its elements commonly include: (1) the total or
virtual extinguishment of tort remedies against the seller as a
consequence of an all-asset sale; (2) the buyer's continued
manufacture of the same product lines under the same product
names; (3) the buyer's continued use of the seller's corporate
name or identity, and trading on the seller's good will; and (4)
the buyer's representation (e.g., advertising) to the public that
it is an ongoing enterprise. See, e.g., Conway, 885 F.2d at 93;
Ray, 560 P.2d at 11. 
A three-part policy underlies the "product-line" liability
doctrine: (1) such all-asset acquisitions virtually eliminate
the tort plaintiff's remedies against the seller, which usually
dissolves after the sale; (2) the buyer becomes the most
efficient conduit for effecting the cost-spreading policy at the
root of strict tort liability; and (3) fairness demands that the
buyer the party enjoying the economic benefits of its
predecessor's good will bear the initial financial burden of
its predecessor's contingent product liability. Id. at 8-9.

5

third-party complaint in Alaska state court. Arms asserted that

it acquired Debtor Industries' assets "free and clear" of all

product liability claims against Debtor Industries, except those

disclosed to Arms by Debtor Industries prior to the chapter 11

asset transfer. See supra notes 2 & 3.

B. The Injunction  B. The Injunction

Notwithstanding the contention that it lacked jurisdic-

tion once the asset transfer had been consummated, the bankruptcy

court enjoined further prosecution of Western Auto's third-party

action against Arms in Alaska state court. The bankruptcy court

concluded that it retained the requisite jurisdiction to enjoin

any hostile "claim" which contravened the terms of the asset

transfer agreement approved by the bankruptcy court in the

pending chapter 11 proceeding. Savage Arms, Inc. v. Taylor (In

re Savage Arms, Inc.), No. 88-40046-JFQ, slip op. at 4-5 (Bankr.

D. Mass. Oct. 5, 1992). But cf. Mooney Aircraft v. Foster (In re

Mooney Aircraft), 730 F.2d 367 (5th Cir. 1984) (bankruptcy court

lacks jurisdiction to enjoin successor liability claims arising

one year after close of bankruptcy proceedings). 

The bankruptcy court reasoned that even assuming

Alaska were to adopt a common law "successor product-line

liability" doctrine, see, e.g., Dawejko v. Jorgensen Steel Co.,

434 A.2d 106 (Pa. Super. Ct. 1981); supra note 4 the Western

Auto claim against Arms would be preempted by the Bankruptcy Code

insofar as it constituted a tort "claim" against Debtor

Industries which arose before either the chapter 11 asset

6

transfer or the order confirming the chapter 11 plan. Savage

Arms, Inc., slip op. at 2-3 (citing Volvo White Truck Corp. v.

Chambersburg Beverage, Inc. (In re White Motor Truck Corp.), 75

B.R. 944, 950 (Bankr. N.D. Ohio 1987); American Living Systs. v.

Bonapfel (In re All American of Ashburn, Inc.), 56 B.R. 186, 190

(Bankr. N.D. Ga. 1986)). Since the confirmed chapter 11 plan

restricted claimants to their pro rata share of the net proceeds

realized from the all-assets transfer, the bankruptcy court

considered injunctive relief essential to prevent Western Auto

from circumventing the Bankruptcy Code priority scheme by

obtaining full recovery from Arms, the chapter 11 debtor's

successor. Because Taylor and Western Auto held "claims" against

Debtor Industries that could be dealt with under the confirmed

chapter 11 plan, and since asset transfers under Bankruptcy Code

363(f) are effected "free and clear of any interest" in the

transferred assets,5 the bankruptcy court ruled that the


5Section 363(f) provides:

(f) The trustee may sell property under subsection (b)
or (c) of this section free and clear of any interest
in such property of an entity other than the estate,
only if

(1) applicable nonbankruptcy law permits sale of
such property free and clear of such
interest;
(2) such entity consents;
(3) such interest is a lien and the price at
which such property is to be sold is greater
than the aggregate value of all liens on such
property;
(4) such interest is in bona fide dispute; or
(5) such entity could be compelled, in a legal or
equitable proceeding, to accept a money
satisfaction of such interest.

7

explicit disclaimer in the asset transfer agreement must be given

full effect, at least in the absence of collusion. Savage Arms,

Inc., slip op. at 3. Finally, the court expressed concern that

such successor liability actions might "chill" all-asset sales

under chapter 11 by prompting potential purchasers to hedge their

bids against unquantifiable future product liability costs. Id.

at 5. See also Paris Mfg. Corp v. Ace Hardware Corp. (In re

Paris Indus. Corp.), 132 B.R. 504, 508 n.7 (D. Me. 1991).

Western Auto took an intermediate appeal to the

district court, which concluded that the bankruptcy court lacked

jurisdiction to enjoin prosecution of the Alaska state court

action. This appeal followed.6

II II

DISCUSSION DISCUSSION


Bankruptcy Code 363(f), 11 U.S.C. 363(f).

6After the district court decision, but prior to oral
argument in this appeal, the Alaska court severed the Taylor
claim against Western Auto from the third-party "successor
liability" claim against Arms, allowing the former to proceed to
trial. Judgment eventually entered for Western Auto. Although
it is not known whether Taylor appealed the adverse state court
judgment, failure to do so would not moot the present appeal
since Western Auto represents that it will seek indemnification
for its litigation costs from Arms, based on its "successor
liability" theory. See, e.g., Anderson v. United States Dep't of
Health and Human Servs., 3 F.3d 1383, 1384-85 (10th Cir. 1993)
(noting that although "'a claim of entitlement to attorney's fees
does not preserve a moot cause of action, the expiration of the
underlying cause of action does not moot a controversy over
attorney's fees already incurred'") (citation omitted) (emphasis
added); Heritage v. Pioneer Brokerage & Sales, 604 P.2d 1059,
1065-67 (Alaska 1979) (once retailer establishes an implied-at-
law right to indemnification from product manufacturer, it may
recover its litigation costs and attorney fees in successfully
defending against customer's tort action).

8

The bankruptcy court reasoned that the requisite

jurisdiction to enjoin further prosecution of the state court

"successor liability" action summoned from its power to enforce

its own order approving the all-assets transfer,7 in furtherance

of two fundamental Bankruptcy Code themes: the Code priority

scheme and maximization of creditor recoveries. For the reasons

hereinafter discussed, we believe the rationale undergirding the

bankruptcy court decision is flawed.8


7Even though the bankruptcy court did not do so, Arms has
devoted considerable attention to the precise statutory source of
the bankruptcy court's "jurisdiction" to enjoin prosecution of
the Alaska state court action. See, e.g., 28 U.S.C. 157(a),
1334; Bankruptcy Code 105(a), 11 U.S.C. 105(a). Further,
Arms suggests that it may opt to rescind the chapter 11 asset
transfer if found liable as Debtor Industries' "successor." But
see Zerand-Bernal Group v. Cox, 23 F.3d 159, 164 (7th Cir. 1994)
(rescission of all-asset sale which formed "core and premise" of
chapter 11 plan is precluded 180 days after confirmation of
plan). Western Auto responds that the bankruptcy court lacked
jurisdiction because by the time Savage sought injunctive relief
the reorganization plan had been confirmed and substantially all
chapter 11 estate assets had been distributed to creditors.
Therefore, the Alaska state court action could have had no
conceivable effect on the administration of the chapter 11 case.
See, e.g., In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir.
1991). We need not address these jurisdictional questions, as we
conclude that the bankruptcy court misapprehended the effect of
its July 1989 order approving the asset transfer to Arms. See
infra Section II.B.

8"[We] undertake[] an independent review of the bankruptcy
court order, utilizing the same appellate standards governing the
district court review." Laroche v. Amoskeag Bank (In re Laroche),
969 F.2d 1299, 1301 (1st Cir. 1992). Rulings on permanent
injunctive relief are reviewed for "abuse of discretion." See
Caroline T. v. Hudson Sch. Dist., 915 F.2d 752, 754-55 (1st Cir.
1990); Sturge v. Smouha (In re Petition of Smouha), 136 B.R. 921,
925 (S.D.N.Y. 1992). Four principal factors govern the
appropriateness of permanent injunctive relief: (1) whether the
plaintiff has prevailed on the merits; (2) whether the plaintiff
will suffer irreparable injury absent injunctive relief; (3)
whether the harm to the plaintiff outweighs any harm threatened
by the injunction; and (4) whether the public interest will be

9

A. The Code Priority Scheme A. The Code Priority Scheme

The bankruptcy court expressed concern that unless such

successor liability actions are enjoined, claimants will be

encouraged to forego their chapter 11 remedies in favor of the

more lucrative state-court recoveries conceivably available

against the chapter 11 debtor's successor.

We believe this concern to be unwarranted. For one

thing, it is more illusory than real, given the nature of the

successor product-line liability doctrine itself. See supra note

4. As a general rule, a successor to the chapter 11 debtor would

be absolved of strict tort liability if the claimant failed to

pursue any available chapter 11 remedy. See, e.g., Conway v.

White Trucks, 885 F.2d 90, 95 (3d Cir. 1989) (applying

Pennsylvania law). Yet more conclusively, the "circumvention"

concern relied upon by the bankruptcy court is inapposite to the

present context since there is no record indication that any

attempt was made to afford notice to Taylor or Western Auto as

holders of contingent postpetition product liability claims, see

Bankruptcy Code 502(c), 11 U.S.C. 502(c). We enlarge upon

the latter point.

Notice is the cornerstone underpinning Bankruptcy Code

procedure. Under the Bankruptcy Reform Act of 1978 in a


adversely affected by the injunction. Caroline T., 915 F.2d at
754-55. Although its conclusions of law are subject to plenary
review, the bankruptcy court's findings of fact, "whether based
on oral or documentary evidence," are not to be set aside unless
"clearly erroneous." Fed. R. Bankr. P. 8013.

10

deliberate departure from its forerunners virtually all

administrative responsibilities were removed from the bankruptcy

judge. See, e.g., In re Sullivan Ford Sales, 2 B.R. 350, 353-54

& n.10 (Bankr. D. Me. 1980) (citing Report of the Comm. on the

Judiciary, House of Representatives, To Accompany H.R. 8200, H.R.

Rep. No. 95-595, 95th Cong., 1st Sess. 4, 89-91, 99, 107 (1977)).

Under the Code, therefore, the debtor in possession or trustee

must ensure "parties in interest" adequate notice and opportunity

to be heard before their interests may be adversely affected.

See, e.g., Bankruptcy Code 363(b) ("The Trustee, after notice

and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate.") (emphasis

added); Fed. R. Bankr. P. 6004(a) (mandating notice of proposed

sale); 2002(a)(2) (20 days' notice by mail to "parties in

interest"); see also, e.g., Bankruptcy Code 1109(b), 11 U.S.C.

1109(b) ("parties in interest" have "right to be heard" in

chapter 11 case). The term "parties in interest" encompasses

not only entities holding "claims" against the debtor, but any

entity whose pecuniary interests might be directly and adversely

affected by the proposed action. See, e.g., Yadkin Valley Bank &

Trust Co. v. McGee (In re Hutchinson), 5 F.3d 750, 756 (4th Cir.

1994); In re Athos Steel & Aluminum, Inc., 69 B.R. 515, 519

(Bankr. E.D. Pa. 1987). "[N]otice . . . means . . . such notice

as is appropriate in the particular circumstances . . . ."

Bankruptcy Code 102(1), 11 U.S.C. 102(1) (emphasis added);

Fed. R. Bankr. P 2002(k) (empowering court to order publication

11

of notice to "parties in interest" where "desirable" or notice by

mail is "impracticable"). Thus, in the first instance the Code

consigns to the proponents, rather than to the bankruptcy court,

the preliminary determination whether a proposed disposition of

estate assets adversely affects "parties in interest." See In re

Sullivan Ford, 2 B.R. at 353-54 ("appropriate" notice to "parties

in interest" is indispensable); cf., e.g., In re Northern Star

Indus., Inc., 38 B.R. 1019, 1021 (E.D.N.Y. 1984) (hearing

dispensable if parties in interest are afforded proper notice and

interpose no timely objection); In re Robert L. Hallamore Corp.,

40 B.R. 181, 183 (Bankr. Mass. 1984) (same); Fed. R. Bankr. P.

6004, advisory committee note, subsection (e).9

Bankruptcy Code 102(1) is founded in fundamental

notions of procedural due process. See In re Center Wholesale



9The Code "notice" requirements have even greater force in a
case like the present, where the order approving the proposed
sale authorized a transfer of substantially all chapter 11 estate
assets for present purposes, the functional equivalent of an
order confirming a conventional chapter 11 reorganization plan.
As such, the order confirming a chapter 11 liquidation sale
warrants especial bankruptcy court scrutiny. See In re Abbotts
Dairies, 788 F.2d 143, 150 (3d Cir. 1986) (noting that "[ 
363(b)(1)] mirrors the requirement of section 1129 that the
bankruptcy court independently scrutinize the debtor's
reorganization plan"); In re Wilde Horses Enters., 136 B.R. 830,
841 (Bankr. C.D. Cal. 1991) ("'The key to the reorganization
Chapter . . . is disclosure. . . .'") (citation omitted)
(emphasis added); In re George Walsh Chevrolet, Inc., 118 B.R.
99, 101 (Bankr. E.D. Mo. 1990); In re Channel One Communications,
Inc., 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990); In re Industrial
Valley Refrigeration and Air Conditioning Supplies, Inc., 77 B.R.
15, 17 (Bankr. E.D. Pa. 1987); see generally David A. Skeel, The
Nature and Effect of Corporate Voting in Chapter 11 Re-
organization Cases, 78 Va. L. Rev. 461, 496 (1992) (collecting
cases advocating "enhanced scrutiny" of liquidation sales
preceding chapter 11 plan confirmation).

12

Inc., 759 F.2d 1440, 1449 (9th Cir. 1985); In re Garland Corp., 6

B.R. 456, 459 (Bankr. 1st Cir. 1980) ("The right to be heard 'has

little reality or worth unless one is informed that the matter is

pending and can choose for himself whether to appear or default,

acquiesce or contest.'") (quoting Mullane v. Central Hanover Bank

and Trust Co., 339 U.S. 306, 314 (1950)). Since Taylor and

Western Auto, as "parties in interest," were never afforded

"appropriate" notice of the chapter 11 proceeding, the chapter 11

plan, or the privately negotiated terms of the asset transfer

agreement, not only do their state-law based successor liability

claims against Arms survive the chapter 11 proceeding but their

claims against Debtor Industries as well. See, e.g., Dalton Dev.

Project v. Unsecured Creditors Comm. (In re Unioil), 948 F.2d

678, 683 (10th Cir. 1991) (Bankruptcy Code) (chapter 11 claim

whose holder was afforded no notice is not subject to discharge);

2 Lawrence P. King, Collier on Bankruptcy, 363.13, at 363-43

(15th ed. 1992) (noting that the Code concern for finality in

bankruptcy sales "will not, however, protect a party buying from

the trustee in a sale free and clear of liens where no notice is

given to the lienholder [and] [s]uch a purchaser will be held to

have purchased subject to the lien"); Bankruptcy Code

727(a)(1), 1141(a), (d)(3), 11 U.S.C 727(a)(1), 1141(a),

(d)(3); see also City of New York v. New York, New Haven &

Hartford R.R., 344 U.S. 293, 296-97 (1953) (Bankruptcy Act). 

Thus, even assuming that the Western Auto successor

liability claim constituted an "interest" in the Debtor

13

Industries chapter 11 assets transferred to Arms and that it

would be extinguishable under section 363(f) "after notice and a

hearing," Bankruptcy Code 102(1), 11 U.S.C. 102(1); but cf.

Zerand-Bernal Group v. Cox, 23 F.3d 159, 164 (7th Cir. 1994)

(Posner, C.J.) (suggesting that 363(f) cannot be employed to

extinguish successor product-line liability claims), there can be

no question that its claim could not be extinguished absent a

showing that Western Auto was afforded appropriate notice in the

particular circumstances. See Bankruptcy Code 1109(a), 11

U.S.C. 1109(a); Fed. R. Bankr. 2002(a)(2), 2002(k), 6004(a);

see also Hoffman v. Hoffman, 157 B.R. 580, 584 (E.D.N.C. 1992)

(burden rests with trustee or debtor in possession to establish

appropriate notice). Arms concedes that Debtor

Industries never attempted notice to retailers or wholesalers of

firearms manufactured by Debtor Industries. Arms now argues that

direct notification would have entailed exorbitant financial and

logistical burdens unwarranted in the circumstances. There is no

suggestion, however, that either the identity or the whereabouts

of large-volume firearms distributors like Western Auto did not

appear in Debtor Industries' business records as wholesalers or

retailers of its firearms. Furthermore, the asset transfer

agreement itself disclosed that forty-four product liability

claims were pending in the chapter 11 proceedings against Debtor

Industries by the time the asset transfer was consummated, see

supra note 3, which strongly suggests that Debtor Industries may

have been on notice that certain types of firearms (hence,

14

particular distributors) may have been prominent candidates for

future indemnification claims. These unresolved factual

determinations were for the bankruptcy court, had the parties to

the all-asset transfer alerted the court to their intention to

negotiate the "free and clear" transfer term at issue here. Even

assuming direct notice were proven impracticable, however, Debtor

Industries concededly made no attempt to provide notice by

publication, see Fed. R. Bankr. P. 2002(k); Novak v. Callahan (In

re GAC Corp.), 681 F.2d 1295, 1300 (11th Cir. 1982) (direct mail

unnecessary if class large); Trump Taj Mahal Assocs. v. Alibraham

(In re Trump Taj Mahal Assocs.) 156 B.R. 928, 938-41 (Bankr. D.

N.J. 1993) (notice by publication may be adequate for "unknown"

creditors).

As it was never determined "appropriate in the

particular circumstances" for Debtor Industries and Arms to

dispense with all notice and opportunity to be heard on the part

of potential claimants like Taylor and Western Auto, it would

border on the bizarre to conclude that the third-party complaint

Western Auto filed against Arms in Alaska state court threatened

disruption to any legitimate function served by the Bankruptcy

Code priority scheme which Debtor Industries and Arms subverted

in their private negotiation of the asset transfer agreement.

Furthermore, it cannot seriously be questioned that the central

"notice and hearing" requirement prescribed by the Bankruptcy

Code would be eviscerated were we to presume, as Arms belatedly

suggests, that an entire class of future product liability

15

claimants was beyond the purview of "such notice . . . and such

opportunity for a hearing as [was] appropriate in the particular

circumstances . . . ," Bankruptcy Code 102(1)(A), 11 U.S.C.

102(1)(A).

B. "Chilling" Future Chapter 11 Liquidation Sales B. "Chilling" Future Chapter 11 Liquidation Sales

As an additional basis for injunctive relief, the

bankruptcy court expressed the concern that permitting state-

court successor liability actions to proceed would "chill"

chapter 11 asset bidding because all-asset transfers "free and

clear" would be seen as unenforceable against similarly situated

product liability claimants. Once again we must disagree.

We are satisfied that this largely illusory concern is

entirely of the parties' own making, brought on by their mutual

arrangement for effecting an all-asset transfer without regard to

basic Bankruptcy Code notice requirements. Thus, even assuming

that state-law based successor product-line liability claims may

be barred through recourse to Bankruptcy Code 363(f), but see

Zerand-Bernal Group, 23 F.3d at 164, the all-asset transfer to

Arms could effect no settlement or discharge of the Western Auto

claim against Debtor Industries let alone the state-law based

successor liability claim against Arms absent both appropriate

notice and court approval. See supra note 9.10 


10The procedures utilized below differed markedly from those
employed in the cases cited by the bankruptcy court. See, e.g.,
Paris, 132 B.R. at 506 n.2 (order approving sale incorporates
extant counteroffer by reference); In re White Motor, 75 B.R. at
947 (approval order confirms extant sale agreement "in all re-
spects"); see also Zerand-Bernal Group, 23 F.3d at 161
(bankruptcy court approval order "reserv[ed] jurisdiction to

16

The failure to afford appropriate notice pursuant to

Bankruptcy Code 102(1) and to obtain bankruptcy court approval

of the asset transfer agreement terms privately negotiated

between Debtor Industries and Arms precluded a legitimate basis

for enjoining the Alaska state court action. See In re Federal

Shopping Way, 717 F.2d 1264, 1270 (9th Cir. 1983) (noting that a

bankruptcy court has no jurisdiction to issue "an injunction to

enforce an order [it] did not make"); In re Wilde Horses, 136

B.R. 830, 841 (Bankr. C.D. Cal. 1991) ("The essential purpose

served by disclosure [in an all-asset sale] is to ensure that

parties in interest are not left entirely at the mercy of the

debtor and others having special influence over the debtor.");

see also supra notes 2 & 8. Participants in chapter 11 all-asset

sales parties and bidders alike can avoid this

jurisdictional "no man's land" by ensuring compliance with Code

notice requirements to "parties in interest," see Bankruptcy Code


enforce" extant agreement containing a provision which
extinguished product liability claims). The order purportedly
approving the asset transfer to Arms preceded the private
agreement between the parties to transfer Debtor Industries'
assets "free and clear" of future product liability claims.
Compare, e.g., In re G.S.F., 938 F.2d at 1478 (indicating that
the pertinent inquiry is what the court order said, not what the
court may have intended to say). After prescribing protective
provisions for the benefit of objecting creditors who had been
afforded appropriate notice of the proposed asset transfer, the
bankruptcy court order pre-authorized the asset transfer absent
either notice or substantive protections for holders of contin-
gent product liability claims in the confirmed chapter 11 plan or
the order approving the asset transfer agreement. Indeed, there
is no indication in the appellate record that the bankruptcy
court itself learned about the terms on which the parties to the
asset transfer agreement proposed to deal with such contingent
product liability claims until after Arms commenced the present
adversary proceeding to enjoin the Alaska state court action.

17

102, 11 U.S.C. 102, and, in problematic circumstances, by

securing a timely bankruptcy court determination as to the notice

and opportunity for hearing appropriate in the particular

circumstances. See In re Blehm Land & Cattle Co., 71 B.R. 818,

822-23 (D. Colo.) (noting that the bankruptcy court serves as no

mere "rubber stamp" under Bankruptcy Code 362(d), 363(b),

364(b); and "refus[ing] to assume that the unapproved contractual

Agreement would have been approved by [the court]"), rev'd on

other grounds, 859 F.2d 137 (10th Cir. 1988).

III III

CONCLUSION CONCLUSION

We express no view as to whether Bankruptcy Code

363(f) enables the extinguishment of state-law based successor

"product-line" liability claims. But see Zerand-Bernal Group, 23

F.3d at 164. We hold only that the parties to an all-asset

transfer conducted under the auspices of chapter 11 are not

entitled to rely on the protective jurisdiction of the bankruptcy

court to enjoin the prosecution of a state-law based successor

product-line liability action against an all-asset transferee

when the state court plaintiff was neither afforded appropriate

notice of the material terms of the all-asset transfer, nor of

the chapter 11 plan. Moreover, even assuming appropriate notice

under Bankruptcy Code 102(1), prior to dispensing injunctive

relief the bankruptcy court must ascertain, at the threshold,

that the particular successor liability action poses a genuine

18

threat to the legitimate operation of the provisions of the

Bankruptcy Code, and not merely to the private enforcement of a

closet term in an agreement negotiated between the chapter 11

debtor and its successor. As there was no threshold showing in

the present case, we need not consider the other prerequisites to

permanent injunctive relief. See supra notes 7 & 8. The

district court order must be affirmed. The district The district

court order vacating the bankruptcy court injunction is affirmed; court order vacating the bankruptcy court injunction is affirmed;

costs to defendant-appellee.  costs to defendant-appellee

19